[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 323.]

THE STATE OF OHIO, APPELLEE, *v*. SMITH, N.K.A. MAHDI, APPELLANT.

[Cite as *State v. Smith*, 2000-Ohio-166.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-552—Submitted March 7, 2000—Decided July 26, 2000.)

APPEAL from the Court of Appeals for Lucas County, No. L-94-093.

_____

{¶ 1} On the evening of May 26, 1993, defendant-appellant, Vernon Smith, n.k.a. Abdullah Sharif Kaazim Mahdi, and Herbert Bryson robbed the Woodstock Market located at the corner of Woodstock and Avondale in Toledo. During the robbery, Smith fired a single shot at the upper chest of Sohail Darwish, causing his death. Approximately two weeks later, Smith was arrested and then indicted on one count of aggravated murder with a firearm specification, and a death penalty specification alleging that Smith was the principal offender in committing aggravated murder during an aggravated robbery. Smith was also indicted on three counts of aggravated robbery. Subsequently, Smith was found guilty as charged by a jury and sentenced to death.

{¶ 2} During the afternoon of May 26, 1993, Smith met up with Herbert Bryson and Lamont Layson at a dirt basketball court in a park at Highland and Maplewood in Toledo. The trio discussed "hitting a lick," *i.e.,* committing a robbery. The group got in Bryson's car, and Smith directed them to the corner of Woodstock and Avondale, where the Woodstock Market was located. Layson remained in the car while Smith and Bryson headed toward the carryout. Jeremiah Bishop, who was two houses down from the Woodstock Market at that time, saw Smith and another person enter the carryout.

{¶ 3} Bryson testified that after he and Smith entered the carryout, they noticed only two people in the store, both of whom were behind the counter.

Bryson asked about a type of beer, and the storeowner, Sohail Darwish, came around the counter and walked over to the cooler to assist him. Darwish retrieved a forty-ounce beer bottle from the cooler and placed it on the counter. Bryson did the same. As Darwish was ringing up the sale on the cash register, Smith brandished a black gun and ordered Darwish to "[o]pen the cash register, motherfucker."

{¶ 4} Darwish, who was standing next to Bryson, put his hands up in the air and did not resist. Bryson went behind the counter and hit several buttons on the cash register, trying to open it. Bryson then ordered Darwish to open the cash register, which he did. Darwish then put his hands back up in the air.

{¶ 5} Osand Tahboub, a former co-worker who was visiting Darwish at the carryout at that time, testified that the gunman then told Darwish to "[m]ove and empty your wallet, motherfucker." As Darwish was reaching for his wallet, Smith fired a single shot, hitting Darwish in the chest. Smith then ordered Tahboub to empty his wallet as well, and the two assailants then fled the scene. Darwish was able to push the alarm button before he fell to the floor. As a result of the single gunshot wound to the upper left side of his chest, Darwish bled to death.

{¶ 6} After Smith and Bryson left the carryout, Layson, who was waiting in Bryson's car, noticed Smith holding a gun in his hand when he and Bryson climbed back into the automobile. According to Layson, Smith exclaimed, "[D]ang, I forgot the beer." When Bryson asked Smith "why did he do it," Smith replied that he shot the man "in the arm" because "he moved too slow," and that "[h]e took too long * * * [o]pening the cash register."

{¶ 7} According to Layson, Smith then said, "[F]uck him, he in our neighborhood anyway. He shouldn't be in our neighborhood with a store no way." Later, Smith and Bryson split the money taken in the robbery, which was apparently over $400. They also gave Layson all the stolen food stamps from the robbery plus $50.

{¶ 8} On June 9, approximately two weeks after the murder, police detective Dennis Richardson received information that persons possibly involved in a homicide were incarcerated in the Sandusky County Jail. Based on this and other information he received from sources, Richardson made up an eight-man photo array, including a photo of Herbert Bryson, to show to Tahboub. The next day, upon viewing the array, Tahboub selected Bryson's photo as "[n]ot the guy with the gun, but the other guy." Based on this information and the fact that computer records showed Smith as a known associate of Bryson, Richardson compiled a second photo array that included a picture of Smith. Richardson showed Tahboub the second photo array, and Tahboub immediately selected Smith's photo as that of the gunman.

{¶ 9} Consequently, Smith was arrested, and along with Bryson and Layson, was indicted by the grand jury in the Darwish murder. In count one, Smith was charged with aggravated felony-murder during an aggravated robbery. A death penalty specification attached to this count alleged that Smith was the principal offender in the aggravated murder during a robbery, R.C. 2929.04(A)(7). The second count charged Bryson and Layson with aggravated felony-murder during an aggravated robbery. Counts three through five charged all three defendants with aggravated robbery of the carryout, of Darwish, and of Tahboub respectively. All five counts also carried firearm specifications.

{¶ 10} Prior to trial, defense counsel informed the trial judge that the prosecution had offered Smith a plea bargain to avoid the death penalty. However, Smith declined the plea offer contrary to the advice of defense counsel. At an in-chambers conference, Smith reiterated his desire to decline the plea bargain and proceed to trial.

{¶ 11} A jury trial was held wherein both Bryson and Layson testified for the state as a result of plea agreements. Bryson, who was in the carryout at the time of the shooting, testified that Smith fired the gunshot that caused Darwish's death.

Layson testified that Smith exhibited no remorse when he admitted that he had shot the carryout owner. Tahboub also testified and identified Smith as the murderer. The defense presented no witnesses and made no closing argument at the conclusion of trial. After deliberation, the jury found Smith guilty as charged.

{¶ 12} At the mitigation hearing, several witnesses testified on Smith's behalf, including his wife, mother, and a psychologist, Robert Kahl, who evaluated Smith. In Kahl's opinion, Smith suffers from a mental illness, but Kahl was unable to identify it specifically, since he was unable to complete his evaluation due to Smith's lack of cooperation during the interview process. Smith's mother testified that Smith's biological father was never around during Smith's childhood. In addition, Smith's stepfather physically abused the mother in front of the children, including Smith. Smith's wife, Grace Smith, testified that Smith broke down and cried one or two days after the murder and told her that it was an accident, and that he didn't mean to do it. The jury recommended death, and the court imposed the death sentence on Smith.

{¶ 13} Upon appeal, the court of appeals affirmed the convictions and death sentence in a split decision. While agreeing with the decision to affirm the convictions, the dissenting appellate judge found substantial residual doubt as to Smith's intent which, when combined with the other mitigating factors, "outweighs the aggravating circumstance proven." The dissent reasoned that it was "fundamentally unfair" to retroactively apply *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, since Smith was tried before *McGuire* was announced, when residual doubt was still a legitimate mitigating factor. The dissent further observed that "[t]he unfairness occurs because the defense withheld certain evidence going to [Smith's] intent in the guilt phase, undoubtedly believing it to be more persuasive as going toward residual doubt in the penalty phase."

{¶ 14} The cause is now before this court upon an appeal as of right.

————————————

*Julia R. Bates,* Lucas County Prosecuting Attorney, and *Craig T. Pearson,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* Ohio Public Defender, *J. Joseph Bodine, Jr., Angela Greene* and *Richard J. Vickers,* Assistant State Public Defenders, for appellant.

_____

**MOYER, C.J.**

{¶ 15} Appellant Smith raises ten propositions of law. We have reviewed each one and have determined that none justifies reversal of Smith's conviction for aggravated murder and the other crimes he committed. Pursuant to R.C. 2929.05(A), we have also independently reviewed the record, weighed the aggravating circumstance against the mitigating factors, and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm Smith's convictions and death sentence.

Inquiry on Racial Bias/Effective Assistance

{¶ 16} In his first proposition of law, Smith asserts that counsel were ineffective for failing to question the venire concerning religious or racial bias, since the crimes in issue were interracial in nature. Smith contends that counsel's ineffectiveness throughout trial, including the presentation of "racially charged evidence," can be traced to counsel's failure to examine the jurors on racial bias prior to trial.

{¶ 17} Since Smith failed to raise this issue before the court of appeals, we consider this issue to be waived. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus.

{¶ 18} Smith argues, albeit in a footnote, that if his argument is considered waived, his appellate counsel gave him ineffective assistance.[1] However, we find that Smith has failed to demonstrate ineffective assistance of trial counsel.

_____

1. This argument will be addressed under Smith's Proposition of Law No. 6.

{¶ 19} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 20} Smith asserts many conclusions, one of which is that the trial was racially charged, since the murder was committed by a black man and the victim was "a man of Arabic descent who operated a grocery store in the inner city." Characteristic of Smith's arguments under this proposition is his conclusion that "[b]ecause the conflict between blacks and the immigrant newcomers envelops the overall debate on black/white relations, racism may have been a factor in the jury's decision to convict [Smith] of aggravated murder." (Footnote omitted.) Other examples of Smith's argument that the entire trial was fraught with racially charged evidence include trial counsel's strategy during the mitigation phase to highlight the black "gangsta" movie "Menace II Society," relying on the testimony of an Islamic jail counselor, citing the movie "Malcolm X," and relating defendant's story of life in the inner city.

{¶ 21} Smith relies on *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 106 S.Ct. 1683, 1688-1689, 90 L.Ed.2d 27, 37, for the proposition that a capital defendant accused of an interracial crime is entitled to have the venire questioned so as to reveal any possible racial bias. Smith contends that, in the racially charged atmosphere of this case, competent counsel would have taken advantage of that entitlement.

{¶ 22} In our view, Smith's arguments are purely speculative and unconvincing. We have held that "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Moreover,

as we noted in *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, 108, under *Turner v. Murray*, the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel. *Id.*, 476 U.S. at 37, 106 S.Ct. at 1688, 90 L.Ed.2d at 37, and fn. 10.

{¶ 23} Here, the mitigation transcript indicates that counsel elicited testimony that Smith saw the movie "Menace II Society" earlier on the day of the shooting. In the beginning of the movie, a black man shoots and kills a nonblack storeowner. However, this fact was evidently elicited to support the expert testimony that Smith suffered a mental defect that caused him to become psychotic for a temporary period of time. In the defense psychologist's professional opinion, it was no coincidence that, after seeing what occurred in the movie, Smith committed a similar crime later that day. Clearly, counsel were attempting to portray Smith as someone who was unstable and prone to psychotic displays such as the murder of Darwish, which reprised a scene in the film Smith had seen earlier that day. Far from creating a racially charged atmosphere, it appears that trial counsel attempted to explain Smith's murder of Darwish in a way that could lead jurors to view Smith as less blameworthy for his actions.

{¶ 24} Counsel's chronicling of Smith's life story in the inner city does not indicate ineffective assistance. It was likely designed to portray Smith as a victim of his background and upbringing, and thus not deserving of death. The testimony of the Islamic jail counselor attempted to show Smith as a person who has now turned to religion. The references to Malcolm X were raised by defense counsel during examination of the Islamic counselor. As brought out in the trial transcript, such questions appear to have been designed to elicit testimony that the type of Islamic belief Smith was turning to was not the "nationalistic brand" of Islamic belief once espoused by Malcolm X. Moreover, Smith's troubled inner city background and his religious conversion are unquestionably valid mitigating factors, and it was not ineffective assistance to bring them to the jury's attention.

**{¶ 25}** Counsel could have properly determined that the examination of jurors' racial views during voir dire would be unwise, since the subject of racial prejudice is sensitive to most people, and raising it during voir dire could cause some jurors to be less candid if confronted with direct questions attempting to discern any hint of racial prejudice. In addition, our reading of the record leads us to conclude, contrary to Smith's assertions, that racial issues were not "woven into the fabric of trial."

**{¶ 26}** Yet, even if we viewed counsel's trial strategy as questionable, such a strategy should not compel us to find ineffective assistance of counsel. In these situations, we normally defer to counsel's judgment. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192. Since we find no legitimate basis for Smith's assertions that counsel were ineffective for not examining the venire on racial or religious bias, this proposition is not well taken.

Competency Evaluation

**{¶ 27}** In Proposition of Law No. 5, Smith contends that the trial court erred in failing to order a competency evaluation *sua sponte*. Smith claims that numerous incidents, when considered together, should have alerted the trial court that defendant was mentally incompetent. Among the incidents cited are Smith's refusal to heed counsel's advice to accept a plea bargain prior to trial; his refusal to waive a jury trial in favor of a three-judge panel; his insistence on appearing at trial in jail clothes and a kuffa (prayer cap); his waiver of a potentially valid *Batson* claim; his declaration in chambers that he did not want any family members testifying at his mitigation hearing; his decision not to give an unsworn statement during the mitigation phase and his refusal to speak at his sentencing hearing; and his refusal to continue cooperating with the defense expert psychologist.

**{¶ 28}** It has long been recognized that "a person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

*Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103, 113. "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, 438, citing *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 29} In Ohio, R.C. 2945.37(B) requires a competency hearing if a request is made before trial. But "[i]f the issue is raised after the trial has commenced, the court shall hold a hearing on the issue only for good cause shown or on the court's own motion." *Id*. Thus, "the decision as to whether to hold a competency hearing once trial has commenced is in the court's discretion." *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 325, 492 N.E.2d 401, 410. The right to a hearing "rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial." *State v. Berry*, 72 Ohio St.3d at 359, 650 N.E.2d at 439, citing *Drope* and *Pate*, *supra*.

{¶ 30} However, the record in this case does not reflect "sufficient indicia of incompetence" to have required the trial court to conduct a competency hearing. During the mitigation hearing, defense psychologist, Robert Kahl, testified that Smith suffers a mental illness, but he was not certain how to categorize it. Yet, Kahl also opined that Smith was competent to stand trial. "The term 'mental illness' does not necessarily equate with the definition of legal incompetency." *Berry, supra,* 72 Ohio St.3d 354, 650 N.E.2d 433, syllabus. "A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 209, 502 N.E.2d 1016, 1018.

{¶ 31} In addition, we note that defense counsel did not enter an insanity plea or suggest that Smith lacked competence. Counsel had ample time to become familiar with Smith, since they represented him from their appointment in June or

July 1993, through the March 1994 sentencing. While Smith may have lacked judgment in rejecting his attorneys' advice, his competence was never an issue, either before, during, or after trial. If counsel had some reason to question Smith's competence, they surely would have done so. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 411, 692 N.E.2d 151, 157.

{¶ 32} It is true that defense counsel twice requested in-chambers conferences: (1) prior to trial they informed the court that Smith rejected their advice to accept a plea agreement to avoid a possible death sentence, and (2) during the mitigation phase when they informed the court that Smith did not want to present mitigation witnesses. However, at neither time did counsel or the trial judge think that Smith's behavior raised any question as to his competence. See *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298, 313.

{¶ 33} Accordingly, neither Smith's behavior at trial nor the expert testimony proffered on his behalf provided "good cause" or "sufficient indicia of incompetence." Thus, we find that the trial court did not abuse its discretion by declining, *sua sponte*, to direct such a hearing. See *Berry, supra*, 72 Ohio St.3d 354, 650 N.E.2d 433; *Rahman, supra*, 23 Ohio St.3d at 156, 23 OBR at 323, 492 N.E.2d at 410. Deference on such issues should be granted to those "who see and hear what goes on in the courtroom." *Cowans, supra*, 87 Ohio St.3d at 84, 717 N.E.2d at 312. Therefore, we overrule Proposition of Law No. 5.

Jury Instructions

{¶ 34} In Proposition of Law No. 3, Smith argues that the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter. Smith asserts that the fact that the jury struggled with intent during deliberations fortifies the conclusion that the evidence "reasonably supported" the defense request for the lesser included offense instruction.

{¶ 35} Involuntary manslaughter is a lesser included offense of aggravated murder. *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus. The difference between the two offenses is that aggravated murder requires a purpose to kill, while involuntary manslaughter requires only that a killing occurred as a proximate result of committing or attempting to commit a felony. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 218, 15 OBR 311, 357, 473 N.E.2d 264, 310.

{¶ 36} However, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Thomas*, *supra*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus; *State v. Palmer* (1997), 80 Ohio St.3d 543, 562, 687 N.E.2d 685, 702. In making this determination, the court must view the evidence in the light most favorable to the defendant. *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 532, 415 N.E.2d 303, 308; *State v. Campbell* (1994), 69 Ohio St.3d 38, 47-48, 630 N.E.2d 339, 349.

{¶ 37} While the trial record indicates that the jury twice submitted questions to the court during deliberations regarding purpose and intent, Smith's assertion that the jury must have struggled with such terms is purely speculative. A more reasonable explanation for these specific inquiries was the fact that the trial

judge did not give a copy of the jury instructions to the jurors during deliberations because of "the hen scratching that's all throughout them."

{¶ 38} Here, we believe the evidence presented at trial did not compel an involuntary manslaughter instruction. Smith helped plan the robbery and directed his accomplices to Woodstock Market to achieve that goal. Once inside the carryout, Smith brandished a loaded weapon, pointed it at Darwish, and shot him once in the chest. According to eyewitnesses to the shooting, Darwish was totally cooperative with Smith and offered no resistance whatsoever. Smith never claimed during trial that the shooting was accidental or unintentional, although he did tell Bryson and Layson that he shot Darwish "in the arm." Moreover, when his accomplices asked him why he shot Darwish, Smith displayed no hint of remorse in replying that Darwish took too long opening the cash register, and "fuck him, * * * [h]e shouldn't be in our neighborhood with a store no way."

{¶ 39} This evidence is clearly at odds with Smith's assertion that evidence of purpose or intent to kill was lacking. Smith's claims that the evidence "reasonably supported" an involuntary manslaughter instruction do not withstand scrutiny. See *State v. Raglin* (1998), 83 Ohio St.3d 253, 258, 699 N.E.2d 482, 488, and *State v. Sheppard* (1998), 84 Ohio St.3d 230, 236-237, 703 N.E.2d 286, 293, where we upheld similar refusals by a trial court to instruct on involuntary manslaughter.

{¶ 40} In view of the evidence presented during the trial phase, even when viewed in a light most favorable to Smith, the trial court did not err in refusing to instruct on involuntary manslaughter. No specific evidence submitted at trial raised the issue of involuntary manslaughter. We believe that under any reasonable view of the evidence proffered during the trial phase, the killing of Darwish was purposeful. *Raglin, supra*, 83 Ohio St.3d at 257-258, 699 N.E.2d at 488. Accordingly, we reject Smith's third proposition of law.

**{¶ 41}** In Proposition of Law No. 9, Smith argues that the jury instructions on reasonable doubt, patterned after the language of R.C. 2901.05, allowed the jury to find him guilty based on a degree of proof below that required by due process. This issue was waived because Smith failed to object to the instructions, *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus, and because Smith failed to raise it before the court of appeals. *Williams, supra*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus. Even if we were to consider the issue, we have rejected similar arguments in a number of cases. See, *e.g.*, *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232-233, 594 N.E.2d 604, 606; *State v. Stojetz* (1999), 84 Ohio St.3d 452, 467, 705 N.E.2d 329, 343.

## SENTENCING ISSUES

### Jury Instructions/Sentencing Opinion

**{¶ 42}** In Proposition of Law No. 2, Smith contends that the trial court erred in instructing the jury to weigh the aggravating circumstance against each mitigating factor, instead of all the mitigating factors raised at the mitigation hearing. Smith further asserts that the trial court committed the same error in parts of its sentencing opinion. Smith also claims that the trial court incorrectly identified the aggravating circumstance by stating at trial that Smith was the "principal offender in the aggravated robbery" rather than principal offender in the aggravated murder.

**{¶ 43}** Smith is correct in asserting that the jury instructions were erroneous under R.C. 2929.03(D)(2) and R.C. 2929.04(A)(7). However, Smith failed to object to either instruction at trial. Moreover, he failed to complain about the defective instructions before the court of appeals as well. Smith thus waived any error unless, but for the error, the outcome of the trial clearly would have been otherwise. *Underwood, supra*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; *Williams, supra*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364,

paragraph two of the syllabus. (Smith also failed to object to the incorrect use of the plural "aggravating circumstances" on the verdict form, and thereby waived that error as well.)

{¶ 44} The errors Smith alleges were not outcome-determinative, and hence did not amount to plain error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. In fact, the record indicates that the trial court corrected its erroneous instruction concerning the weighing process by providing the correct standard when it reread the sentencing instructions at the outset of the second day of deliberations upon a specific request by the jury. Moreover, the verdict form signed by all the jurors set forth the correct weighing standard.

{¶ 45} The error in the specification instruction given during the sentencing phase ("principal offender in the aggravated robbery") did not appear on the verdict form signed by all the jurors at the close of *guilt-phase* deliberations. Nor did any evidence at trial suggest that anyone else but Smith shot the victim. Thus, the instructional error at the close of the sentencing phase was, under these circumstances, inconsequential, since the jury had already convicted Smith of the aggravating circumstance employing the correct language. Overall, we believe that the jury understood the proper sentencing standard as well as its sentencing responsibility. See *State v. Hill* (1995), 73 Ohio St.3d 433, 438, 653 N.E.2d 271, 277-278.

{¶ 46} We therefore hold that none of these alleged errors resulted in a clear miscarriage of justice, *State v. Slagle* (1992), 65 Ohio St.3d 597, 608, 605 N.E.2d 916, 928, especially upon viewing the instructions in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. They do not amount to plain error sufficient to defeat the waiver rule.

**{¶ 47}** With regard to Smith's assertion that the trial court committed error in the weighing process in its sentencing opinion, that error was in fact raised and found to be well taken by the court of appeals. However, the appellate court found it could cure this error by its own independent review. This court has held that errors in the trial court's weighing process may be cured by our own independent review. See, *e.g.*, *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304; *State v. Hill* (1996), 75 Ohio St.3d 195, 211, 661 N.E.2d 1068, 1083. Likewise, errors in the court of appeals' reweighing may also be cured by our own independent review. *State v. Frazier* (1995), 73 Ohio St.3d 323, 343, 652 N.E.2d 1000, 1017.

**{¶ 48}** The court of appeals also stated that "[o]ur independent analysis of the evidence leads us to find that the mitigating factors do not outweigh the aggravating circumstance." This statement was erroneous. The proper standard in capital cases is that the aggravating circumstance(s) must outweigh the mitigating factors before a death sentence may be affirmed. R.C. 2929.05(A). However, independent review can also cure that error. *Id.*

**{¶ 49}** In sum, the errors alleged by Smith were waived, and we find that these alleged errors were not outcome-determinative and, therefore, not plain error. In addition, the errors in both lower court opinions are curable by independent review. Accordingly, Proposition of Law No. 2 is not well taken.

Sentence Appropriateness

**{¶ 50}** In Proposition of Law No. 8, Smith contends that his death sentence is inappropriate and disproportionate because the aggravating circumstance does not outweigh the cumulative effect of the mitigation present here. We will consider Smith's arguments during our independent review of the sentence.

Effective Assistance

**{¶ 51}** Under Proposition of Law No. 6, Smith claims ineffective assistance of trial counsel. In Proposition of Law No. 7, Smith asserts ineffective assistance of appellate counsel before the court of appeals.

**{¶ 52}** With respect to the claims of ineffective assistance of trial counsel, Smith cites five areas where counsel allegedly provided deficient representation. However, in no instance does Smith demonstrate deficient performance by counsel, or that the allegedly deficient performance prejudiced him so as to deprive him of a fair trial. See *Strickland v. Washington, supra*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Bradley, supra*, 42 Ohio St.3d 136, 538 N.E.2d 373. Moreover, in no instance does Smith demonstrate prejudice, *i.e.*, "a reasonable probability that, were it not for counsel's errors, the results of the trial would have been different." *Id.* at paragraph three of the syllabus.

**{¶ 53}** The first instance listed by Smith (counsel's failure to explore racial or religious bias during jury selection) is fully explored in our discussion under Proposition of Law No. 1. None of the instances raised by Smith constituted deficient performance by defense counsel. The second instance Smith cites is trial counsel's failure to object to erroneous jury instructions. Yet, as discussed under Proposition of Law No. 2, none of these alleged deficiencies prejudiced Smith so as to deprive him of a fair trial.

**{¶ 54}** Likewise, the third and fourth instances in which Smith alleges deficient representation—failing to request a psychiatric evaluation for Smith, and failing to object to the reasonable doubt instruction—did not deprive Smith of a fair trial. As we discussed under Proposition of Law No. 5, Smith did not display sufficient "indicia of incompetence," *Berry,* 72 Ohio St.3d at 359, 650 N.E.2d at 439, to warrant a competency hearing. Counsel's failure to object to the reasonable doubt instruction was of no consequence, since such an instruction based on the

language of R.C. 2901.05 is proper. *State v. Stojetz, supra,* 84 Ohio St.3d at 467, 705 N.E.2d at 343.

{¶ 55} In the final instance of alleged ineffectiveness, Smith claims prejudice in trial counsel's failure to assert a defense or to make a closing argument at the end of the guilt phase. Yet it is plausible in this case that counsel's trial strategy to forgo closing argument prevented the prosecution from making a strong rebuttal. The compelling evidence submitted during trial established that Smith was the killer, especially given the fact that two eyewitnesses to the murder and another accomplice testified that Smith shot Darwish during the robbery. In the face of overwhelming evidence of Smith's guilt, defense counsel apparently chose to concentrate on avoiding a death sentence and making a strong case for mitigation and residual doubt.

{¶ 56} By doing so, counsel did not fall below an objective standard of reasonable representation. This case was tried in March 1994, more than three years prior to our decision in *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, where we held residual doubt to be "irrelevant to the issue of whether the defendant should be sentenced to death." Unfortunately for the defense, neither the jury nor the trial judge was persuaded that sufficient residual doubt existed to prevent imposing a death sentence. Even assuming that defense counsel's trial strategy was questionable, such a strategy did not constitute ineffective assistance of counsel. See *State v. Clayton, supra*, 62 Ohio St.2d at 49, 16 O.O.3d at 37, 402 N.E.2d at 1192.

{¶ 57} Smith's claim that counsel failed to assert a defense to the charges does not appear to be totally accurate. While counsel chose not to present any defense witnesses during the trial phase, they did vigorously cross-examine several key prosecution witnesses. Accordingly, we overrule Proposition of Law No. 6.

{¶ 58} Under Proposition of Law No. 7, Smith claims that appellate counsel were ineffective in failing to assign as errors (1) trial counsel's failure to question

the venire on any racial or religious biases (see Proposition of Law No. 1), (2) the court's use of the reasonable doubt instruction patterned after R.C. 2901.05 (see Proposition of Law No. 9), and (3) the vagueness defect in Ohio's death sentencing scheme (see Proposition of Law No. 10). Given our rejection of all three claims elsewhere in this opinion, none of these alleged instances of ineffective assistance of appellate counsel compels reversal. Moreover, as we have held in prior cases, "[c]ounsel need not raise all nonfrivolous issues on appeal." *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, 353, citing *Jones v. Barnes* (1983), 463 U.S. 745, 751, 103 S.Ct. 3308, 3312-3313, 77 L.Ed.2d 987, 993. In addition, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail * * * is the hallmark of effective appellate advocacy." *Smith v. Murray* (1986), 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434, 445, quoting *Barnes*, 463 U.S. at 751-752, 103 S.Ct. at 3312-3313, 77 L.Ed.2d at 994. Therefore, we reject Smith's Proposition of Law No. 7.

Constitutionality

{¶ 59} In Proposition of Law No. 10, Smith asserts that Ohio's death penalty laws are unconstitutional for various reasons, both facially and as applied. However, these arguments lack merit. See, *e.g., Jenkins, supra,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585*; State v. Carter* (1992), 64 Ohio St.3d 218, 594 N.E.2d 595; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; and *State v. Lewis* (1993), 67 Ohio St.3d 200, 616 N.E.2d 921. Therefore, we summarily reject them here. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

Appellate Review

**{¶ 60}** In Proposition of Law No. 4, Smith contends that the court of appeals' refusal to consider residual doubt as a mitigating factor denied him two levels of meaningful appellate review, since the offense was committed prior to January 1, 1995.

**{¶ 61}** While the jury was instructed on residual doubt, such a factor is no longer mitigating. *McGuire, supra*, 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Accord *State v. Goff* (1998), 82 Ohio St.3d 123, 131, 694 N.E.2d 916, 923; *State v. Mason* (1998), 82 Ohio St.3d 144, 165, 694 N.E.2d 932, 954. Moreover, we have specifically rejected the argument that it is error to apply *McGuire* retroactively. *State v. Bey* (1999), 85 Ohio St.3d 487, 508-509, 709 N.E.2d 484, 503. Thus, Proposition of Law No. 4 is not well taken.

INDEPENDENT REVIEW AND PROPORTIONALITY

**{¶ 62}** In Proposition of Law No. 8, Smith submits that his death sentence is inappropriate and must be vacated because the aggravating circumstance does not outweigh the mitigating factors in this case, especially the mitigating factor of residual doubt.

**{¶ 63}** The facts show that on the day of the murder and robbery, Smith and others discussed "hitting a lick." Smith then directed Bryson and Layson to the Woodstock Market to accomplish their goal of committing a robbery. When Smith and Bryson went into the store, only Smith possessed and produced a weapon. Although Darwish and Tahboub fully cooperated with Smith during the robbery, Smith fired a single shot at Darwish because "he took too long * * * opening the cash register." After the robbery and shooting, Smith's only expressed regret was that he had forgotten the beer he had intended to steal. When Smith's two accomplices pressed him as to why he shot the store owner, Smith replied, "[F]uck him, he in our neighborhood anyway. He shouldn't be in our neighborhood with a store no way."

{¶ 64} Even if defense counsel had attempted to contest the intent element of aggravated murder, it seems unlikely that the jury would have believed his witnesses (if any), as opposed to Smith's accomplices, who participated in the criminal activity. This conclusion would appear to be reasonable, especially since the testimony of Darwish's friend, Tahboub, was largely corroborative of Bryson's testimony as to the circumstances of the robbery and shooting.

{¶ 65} After independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance that Smith, as the principal offender, killed Darwish while committing aggravated robbery. R.C. 2929.04(A)(7).

{¶ 66} The nature and circumstances of the offense provide nothing in mitigation. Prison Islamic religious counselor, Jurry Taalib-Deen, testified that Smith confided with him that he was "nervous and scared and the trigger went off" when he shot Darwish. Yet, such statements seem less credible than those given by Smith to his accomplices immediately after the shooting. While Smith's statements to his accomplices after the shooting could be characterized as street bravado, his statements to the religious counselor could be viewed as a jail house conversion, and thus lacking in credibility. The fact remains that Smith helped plan and then specifically directed the robbery at the Woodstock Market. He was the only one of the three defendants who had a gun. The robbery-murder of Darwish was a senseless, unprovoked, and tragic crime.

{¶ 67} Smith's history, character, and background provide some mitigating features. Smith's wife, Grace, testified that she married Smith while he was in jail in October 1990. At that time, Smith already had fathered a child, who was about three years old. The couple moved to Texas because they wanted a different environment, but they struggled on welfare and thereafter moved back to Toledo. Meanwhile, Grace became pregnant, and their baby was born after the murder. Grace stated that Smith's mother treated her well and showed her love. On the day

of the murder, Grace and Smith went to the movie "Menace II Society," which depicted a robbery and shooting similar to the crime Smith acted out later that evening. One or two days later, Smith broke down and told Grace that he shot Darwish, but he added that it was an accident and that he didn't mean to do it. Grace pleaded with the jury to spare Smith's life.

{¶ 68} Smith's mother, Verna Smith, chronicled Smith's childhood beginning with a biological father who was "not really" around, and who did not provide financial support. Verna later married Willie Smith, Sr., who took Smith as his son, and whom she described as a good father to Smith and his younger brother. However, the elder Smith beat Verna on different occasions in front of the children, which left her with black eyes and bruises. After several years, Verna separated from the elder Smith because of the physical abuse, but she felt that the separation "was devastating" to defendant Smith. After the divorce, Verna supported her children while on welfare. Smith and his brother occasionally visited the elder Smith until his death around 1989. Verna further testified that Smith got suspended from school about six times for fighting when he was twelve or thirteen years old and that his experience at school was "not too good." Verna also asked the jury to spare her son's life.

{¶ 69} Smith's aunt, Patricia Dickerson, felt that Smith had a "very hard life" in the ghetto and that he only knew about life in the streets and how to survive in that environment. Dickerson stated that her sister, Verna, did the best she could in raising Smith given the circumstances of his upbringing. She also asked the jury to spare Smith from a death sentence.

{¶ 70} Smith's uncle, Ronald Dickerson, opined that Smith was a victim of society, who, like a lot of other young people, got cast to the side. In spite of Smith's hard life, Dickerson felt that Smith "always seemed like a nice young man."

{¶ 71} Robert Kahl, the defense psychologist, interviewed and evaluated Smith to determine his emotional and psychological functioning. He also

administered several tests to Smith. Kahl met and interviewed Smith's wife and mother. At his first session with Kahl, Smith was very cooperative. However, at their third meeting, Smith became distant with Kahl and indicated he was not going to participate in further evaluations. In one written exercise Kahl left at the jail for Smith to complete, an "Incomplete Sentences" test, Smith wrote in almost every answer that someone or something, usually Kahl, was "bothering" him. Kahl described Smith as being of average intelligence and initially thought Smith was "fairly normal." According to Kahl, Smith knows right from wrong, but appeared to show signs of depression, which hampered his intellectual functioning. In Kahl's opinion, when Smith is confronted with situations that aroused intense feelings, Smith could lose contact with reality and be self-destructive.

{¶ 72} In reviewing Smith's background, Kahl noted that Smith had been suspended from school for fighting a number of times, beginning at the age of ten. Smith fathered a child when he was fourteen and attended a great number of schools. Kahl concluded that part of Smith's problems was due to a lack of proper parenting and to the presence of significant physical violence in the home. In addition to having only a father substitute in the home, Kahl felt that Smith's mother lacked the skills to raise a child in terms of emotional functioning and how to handle feelings. Kahl further opined that it is clear that Smith learned early on to solve any problems with people by physically intimidating them into doing what he wanted them to do.

{¶ 73} Kahl also noted that it was significant that Smith and his wife watched the movie "Menace II Society" on the day of the murder. In Kahl's opinion, what Smith saw in the movie was related to the similar crime he acted out later that day at the Woodstock Market. Kahl opined to a reasonable degree of psychological certainty that Smith "has a defect in his ability to handle feelings and stress, and when he gets in situations where feelings are high and stress is high, * * * he becomes psychotic for a temporary period of time."

{¶ 74} In Kahl's view, Smith was not able to conform his conduct to the requirements of law on the evening of the shooting. Kahl also stated that Smith has a mental illness or some defect in personality, but he could not be more specific, since he was unable to complete his evaluations of Smith, due to Smith's refusal to cooperate any further.

{¶ 75} With regard to the statutory mitigating factors of R.C. 2929.04(B), factor (3) would appear to be implicated, since the defense psychologist, Robert Kahl, stated that at the time of the shooting, Smith was unable to conform his conduct to the requirements of law. However, we do not find that Kahl's conclusion supports finding the (B)(3) mental disease/defect factor, since Kahl admitted that he was unable to complete his evaluation of Smith. Kahl's inability to define a specific mental disease or defect for Smith's condition detracts from finding the presence of the (B)(3) statutory mitigating factor in this case. Nevertheless, Kahl's findings that Smith suffered from psychotic episodes, including an episode on the day of the murder, must be given some weight as a (B)(7) factor. Yet, the weight we apply to this factor is tempered by the fact that Kahl's evaluation was incomplete due to Smith's refusal to cooperate further in the evaluation process.

{¶ 76} Smith's age of the time of the offense (twenty-one years old) is entitled to some weight under R.C. 2929.04(B)(4). See, *e.g.*, *State v. White* (1999), 85 Ohio St.3d 433, 454, 709 N.E.2d 140, 160. No other specific statutory mitigating factors appear to be applicable except for those under R.C. 2929.04(B)(7).

{¶ 77} In addition to Smith's psychological problems discussed earlier, Smith's upbringing where he witnessed physical violence inflicted on his mother is entitled to some mitigating weight under (B)(7). See, *e.g.*, *State v. Getsy* (1998), 84 Ohio St.3d 180, 207, 702 N.E.2d 866, 891. Also mitigating is the love and support Smith enjoys from his wife and family members. See, *e.g.*, *State v. Mason*

(1998), 82 Ohio St.3d 144, 170, 694 N.E.2d 932, 957. However, residual doubt would be entitled to very little weight in mitigation, even if we had not rejected it as an acceptable mitigating factor in *McGuire, supra*, 80 Ohio St.3d 390, 686 N.E.2d 1112, paragraph one of the syllabus. The testimony of the defense mitigation witnesses that Smith claimed the shooting was accidental or unintentional is not persuasive. In our view, eyewitness testimony by Smith's accomplices and Tahboub clearly negates the notion that Smith did not intend to kill Darwish.

{¶ 78} Upon independent weighing, we hold that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The robbery-murder of Darwish was an unprovoked and senseless act. The death penalty in this case is both appropriate and proportionate when compared to similar cases of murder combined with aggravated robbery where there was the same or even more evidence in mitigation. See *State v. Eley* (1996), 77 Ohio St.3d 174, 672 N.E.2d 640 (devotion and care from family, remorse); *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482 (eighteen years old, poor background, mild brain damage, remorse, cooperation with police); *State v. Sheppard* (1998), 84 Ohio St.3d 230, 703 N.E.2d 286 (close and religious family background, eighteen years old, mental disease/defect); and *State v. Goodwin* (1999), 84 Ohio St.3d 331, 703 N.E.2d 1251 (difficult childhood, nineteen years old, apology to victim's family).

{¶ 79} Based on all the foregoing, we affirm Smith's convictions and sentences, including the death sentence.

*Judgment accordingly.*

DOUGLAS, WALTERS, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

LUNDBERG STRATTON, J., dissents.

SUMNER E. WALTERS, J., of the Third Appellate District, sitting for Resnick, J.

—————————

**LUNDBERG STRATTON, J., dissenting.**

{¶ 80} Because I believe that the defendant was denied his Sixth Amendment right to the effective assistance of counsel due to counsel's failure to voir dire the jury on racial issues, I respectfully dissent.

{¶ 81} I agree with the majority's proposition that " '[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked,' " quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Further, I agree, in general, with the proposition that the decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel. See *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, 108, citing *Turner v. Murray* (1986), 476 U.S. 28, 37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27, 37, and fn. 10. However, I believe that in situations where racial issues have the potential to permeate the entire trial, failure to voir dire the venire regarding racial issues can constitute ineffective assistance of counsel.

{¶ 82} The facts presented at trial demonstrate that racial issues did permeate this trial. The defendant, an African-American from the inner city, was accused of shooting a man of Arabic descent who operated a grocery in the inner city. When asked what defendant's reasons were for shooting the victim, co-defendant Layson testified that after shooting the victim, the defendant told him, "[F]uck him, he in our neighborhood anyway. He shouldn't be in our neighborhood with a store no way."

{¶ 83} During mitigation, defense counsel elicited testimony from defendant's wife, Grace Smith, about the film "Menace II Society," a movie about a group of inner city young men (referring to themselves as "black gangsters") who enter a neighborhood grocery store in the inner city and shoot the non-African-American clerks. Mrs. Smith, who had viewed the movie with her husband earlier on the day of the shooting, described the film as follows: "Well, it was two guys, you know, who thought they were kind of bad * * *. [T]hey was just going to buy

some beer and the guy, the owners of the store * * * were looking at them very strange like you shouldn't belong in here because they were black. * * * [O]ne of the boys in the carryout and the store man * * * had a little words or discrepancy * * * and * * * caused a shooting * * *."

{¶ 84} The parallels between the movie and the facts of this case lead to unavoidable conclusions about racial hatred with regard to the shooting of this Arabic grocery store clerk. Dr. Robert Kahl, a clinical psychologist who testified on behalf of defendant, opined that defendant was depressed and had a great deal of trouble talking about his feelings and that when confronted with situations that aroused intense feelings, he could get out of contact with reality. Dr. Kahl believed that defendant "has a defect in his ability to handle feelings and stress, and when he gets in situations where feelings are high and stress is high, that he becomes psychotic for a temporary period of time." Regarding the movie "Menace II Society," Dr. Kahl opined that "it cannot be coincidence. That this thing happened in the movie and this thing happened later. It cannot—I cannot believe it is coincidence."

{¶ 85} Also during the mitigation phase of the trial, defense counsel elicited testimony regarding another film, "Malcolm X." According to the testimony of an Islamic counselor at the Lucas County Jail, Jurry Taalib-Deen, "Malcolm X" highlights the Nation of Islam, an Islamic splinter group which, according to Taalib-Deen, preaches a "hatred doctrine of blacks being Gods and whites being devils." In addition, Taalib-Deen testified that "Malcolm X" was "nationalistic," and testified that "before [defendant] came in [to the Lucas County Jail], he was into nationalistic."

{¶ 86} Throughout the trial and mitigation phase, the defendant, a follower of the Islamic faith, wore a prayer cap. Counsel attempted to make the jury aware that defendant no longer subscribed to the ideology of the Nation of Islam movement mentioned in the movie "Malcolm X," but rather the peaceful tenets of

the Islamic religion. It is possible that defense counsel's tactic of eliciting this religious testimony was an attempt to evoke the sympathy of the jurors by showing that defendant's religious conversion made him a gentler, more peaceful man today.

**{¶ 87}** Further, the evidence regarding the racial aspects of the films, combined with the psychological evidence from Dr. Kahl, could have been an attempt to demonstrate that defendant's psychological defects permitted him to be influenced by the films, causing him to act in conformity with the violence depicted in the films.

**{¶ 88}** But I believe that issues of race and religion so infected this trial that the failure to voir dire the jury venire on those issues made counsel's performance so deficient that counsel were not functioning as the counsel guaranteed by the Sixth Amendment, and that counsel's errors prejudiced the defendant and deprived him of a trial whose result was reliable. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. If counsel consciously chose these tactics, they had a duty also to choose a jury free of prejudice so that such a tactic would not cause an unfavorable reaction.

**{¶ 89}** These topics, involving highly charged and controversial racial and religious issues, could evoke strong emotional reactions in a jury. Without a careful voir dire of the venire's views and biases on these issues, there is no way to know whether the violent imagery of these two movies (and whether, in fact, any jurors had ever seen them) prejudiced the jury's verdict. Some people believe, rightly or wrongly, that the tenets of the Nation of Islam urge militant violence, a powerful image that could have infected the jury's deliberation. Without a careful rooting out of any potential juror who harbored prejudicial racial or religious views, or who had formed preconceived prejudices about either of the movies or the Islamic movement, there is no way to be sure that the jurors who deliberated were truly fair and impartial.

**{¶ 90}** "Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." *Turner*, 476 U.S. at 35, 106 S.Ct. at 1687, 90 L.Ed.2d at 35. Further, the "risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence." *Id.* at 35, 106 S.Ct. at 1688, 90 L.Ed.2d at 36.

**{¶ 91}** The standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. I believe that evidence of guilt was so overwhelming that the verdict of guilt would not have been affected. However, I cannot so find as to the sentence of death.

**{¶ 92}** No juror was questioned regarding his or her views on racial issues, ethnic issues, or the politics of the Nation of Islam, Muslims in general, or the Islamic religion itself. With the evidence of mitigation present in this case, I do not believe that we can find a reasonable probability that the emotional issues of race, both African-American and Arabic, suffused with religious overtones, did not affect the outcome of the sentencing phase of trial.

**{¶ 93}** Accordingly, I respectfully dissent and would reverse in part the judgment of the court of appeals and vacate the sentence of death.

_____