OPINION
Defendant-appellant, Charles Stacey Brooks, appeals his conviction in the Clinton County Court of Common Pleas for felonious assault, a felony of the second degree. Because the trial court erred by refusing to instruct the jury on the lesser included offense of assault, appellant's conviction is reversed and the matter is remanded for a new trial.
On the evening of April 29, 2000, a group of about fifteen to twenty young people were congregating at the intersection of Doan Street and Grant Street in Wilmington, Ohio. Greg Williams, who drove to the scene, was physically assaulted a short time after exiting his car. Williams was injured and later sought and received medical attention.
Appellant, who was involved in the assault, was indicted on a charge of felonious assault. Appellant pled not guilty, and his first jury trial resulted in a hung jury.
At a second jury trial, the recount of Williams' assault was presented in two different ways. In its presentation of the evidence, the state of Ohio argued that appellant and another young man, John Cumberland (a.k.a John Ames) ("John-John") conspired to assault Williams and that the two young men both caused Williams to suffer serious physical harm. In contrast, the defense's theory of the case was that appellant did not conspire with John-John and that appellant hit Williams only twice (once near his left eye and once in his side), which did not cause serious physical harm. The defense argued that John-John was the person who caused serious physical injury to Williams by hitting him the jaw.
The testimony given at trial included the following:
Williams testified that he was driving by the area looking for girls on the evening in question around 6:00 p.m. or 7:00 p.m. Williams testified that when he drove up to the scene, he did not see appellant anywhere. Williams testified that he saw John-John standing in the middle of the street. John-John came up to Williams' car and asked him what he was going to do. Williams said he was "about to park and get out." Williams testified that he exited his car when Malisa Burns, a friend of his, pulled over in her car. When asked where John-John went after that, Williams replied, "I don't know where he went to."
Williams testified that while he was talking to Burns, appellant "hit me from the side, he blind-sighted me, and that's when my jaw was hit." Williams stumbled back and tried to hit appellant but missed. Williams testified that appellant then hit him in the eye. Williams stated, "somehow I fell down and [appellant] got me to the ground and was hitting me, and then John-John came over there and was helping him kick me * * *." Williams testified that appellant and John-John stopped hitting him after someone said that the police were coming. Afterwards, Williams went to his car and drove home, where he realized that his jaw was badly injured.
Later that night, Williams went to the hospital for medical care. Hospital records demonstrate that Williams' chief complaint was "jaw pain" and that his jaw was seriously injured. According to these records, Williams was "punched in the left side of the face in the jaw. He also was hit to the left side of his chest, but states he has no complaint there." After an examination, a doctor determined that Williams' jaw had been broken.
At the start of his testimony, Williams admitted that he was currently serving a sentence for attempted assault of a police officer and illegal conveyance of drugs into a detention facility. When questioned about his conviction for attempted assault of a police officer, Williams testified that he did not think that he had done anything wrong. When asked about his felony drug conviction, Williams testified that he had a little bit of marijuana in his pocket and had forgotten it was there. During his testimony, Williams denied selling drugs. However, appellant's sister, Tiffany Brooks, later testified that for a period of about a year, Williams provided her with marijuana and cocaine.
On cross-examination, Williams testified that although he saw John-John when he exited his car, he lost sight of John-John before the fight began. Also during cross-examination, the defense pointed to inconsistencies between Williams' trial testimony and his statement to the police. Williams' statement to the police was written by his mother but was signed by Williams. At trial, Williams explained that at the time the statement was given, he could not talk because of the injury to his jaw and did not write the statement because he was under the influence of pain medication. Williams explained that the statement was based upon what he told his mother had happened.
At trial, Williams testified that he did not see appellant when he first arrived upon the scene. In his statement to the police, Williams indicates that he "went up street and waved at [appellant] and John John Cumberlin * * *." At trial, Williams testified that appellant had initiated the fight alone and that John-John only came over to start kicking him after he had fallen to the ground. However, in his statement to the police, Williams indicated that "Stacy John John walked acrossed [sic] street and Stacy hit me. We were fighting and John John started hitting me and pulled me to the ground." Also at trial, Williams testified that he had seen appellant and John-John earlier that day but had not spoken to them. In contrast, Williams' statement to the police states, "I seen [sic] them earlier and spoke and everything was alright." When questioned about inconsistencies between his trial testimony and his statement to the police, Williams stated, "That's what it says on the paper, but now that I've had time to think about, I know what really happened."
On cross-examination Williams was also asked how, if he had been "blind-sighted" by the first punch, he knew that appellant was the person who had first hit him. Williams explained that he had "looked at the direction that the hit came from and [appellant] was right there with his fist balled up telling me come on." When asked if John-John was there too, Williams admitted that he was. Williams was asked again how he knew who hit him, and he replied, "I seen him from the side, and as I was stating earlier that John-John went to the right of me and the hit came from the left of me."
Officer Robert Wilson testified that he responded to a call for help from a Sherman Avenue residence at about 9:30 p.m. or 9:45 p.m. Upon seeing Williams at the Sherman Avenue residence, Officer Wilson called for immediate medical assistance. Officer Wilson noted that there were quite a few people in the house. A second officer, Officer Black, arrived at the house and took statements from a few people who were there. On cross-examination Officer Wilson testified that he did not know why he had been called to the Sherman Avenue residence such a long time after the fight had allegedly occurred.
The prosecution called Tasha Cassell to testify. Cassell could recall hardly anything about the incident except that appellant and John-John were hitting Williams. Even after reading her grand jury testimony, Cassell testified that she was unable to refresh her recollection, and she found it difficult to answer questions from the prosecutor and the defense about the fight. Upon the prosecutor's request, Cassell read aloud lines from her grand jury testimony, in which Cassell stated that appellant had said that he was going to "beat Gregory up." In her grand jury testimony, Cassell also stated that she thought that John-John was there when appellant said this.
Another witness for the prosecution, Jamika Watkins, also had a limited recollection of the incident and had to refer to her grand jury testimony throughout her testimony. Watkins testified that John-John walked across the street to Williams and Williams exited his car. Watkins further testified that Williams was talking to John-John when appellant hit Williams, that Williams tried to hit him back, and then "John-John had got in it." Watkins testified that Williams fell to the ground and John-John began kicking him.
Malisa Burns was also called by the State of Ohio to testify. During the course of her testimony, she was asked to refresh her memory several times by reviewing her grand jury testimony as well as her statement to the police. Burns testified that appellant began the fight with Williams but that John-John also became involved. Burns could not recall very many specific details of the fight, even after reviewing her prior statements. Finally, Burns testified that her statement to the police was "not from what I seen. That's just from what [Williams] told me because I couldn't see." Burns was asked whether Williams had told her things about the fight, and she replied, "Yeah. He was talking to me when I went to his house."
After the close of the state's case, the defense presented its evidence about the fight and the events leading up to it. Like Williams, appellant testified that the fight happened between 6:00 p.m. and 7:00 p.m. However, according to appellant's testimony, he and Williams stared at each other while Williams was driving around in his car. Williams exited his car, and began walking in appellant's direction. Williams stopped to talk to Burns, leaning into her car to say something to her and making a gesture toward appellant. Then appellant and Williams walked toward each other and exchanged a few words, stopping within arm's reach of each other. Appellant testified that Williams brought his hands out of his pocket and appellant believed that Williams was about to grab him or "put his hands on [him]."
Appellant then "threw a punch" that hit Williams "around his left eye." Appellant testified that Williams stumbled backward and "threw maybe two punches." Appellant testified that Williams grabbed him around his waist. Appellant and Williams "locked up," fell to the ground together, and wrestled. Appellant admitted to throwing a body punch at Williams' side when they were rolling on the ground. Appellant further testified that after wrestling on the ground, appellant "came out on top" and "then I drew back to throw another punch and Brian Arrington grabbed my arm and pulled me up off him." Arrington told appellant to "chill out."
Appellant testified that John-John sprinted over as Williams was standing up. John-John "punched [Williams] one time in the side of his face and [Williams] went back down, and then he just started kicking him * * *." Appellant testified that he did not kick Williams. Arrington continued to hold appellant and urged John-John to stop. Appellant testified that he told John-John to "back up" and that John-John eventually stopped.
Easter Dawn Jackson, appellant's cousin, also testified. Jackson testified that although she did not see the beginning of the fight, she saw appellant walking away from Williams while John-John was "standing over top of [Williams] kicking him * * *." Jackson also saw Arrington push John-John back and help Williams up. She then saw Williams get into his car and drive away.
Appellant testified that he hit Williams near his left eye and threw a body punch at his side. According to his testimony, appellant only hit Williams these two times. Appellant testified that John-John hit Williams in the side of his face. Appellant stated that he had not seen or spoken to John-John at all that day before the fight began. During his testimony, Williams agreed that Arrington could have been there during the fight. John-John and Arrington were not witnesses at the trial.
At the close of the evidence, defense counsel requested that the jury be instructed on assault, a lesser included offense of felonious assault. The trial court denied this request, and appellant objected. The trial court instructed the jury on aiding and abetting in the commission of a felonious assault.
During its deliberation, the jury posed three questions to the trial court. First, the jury asked, "Can we get a copy of Greg Williams [sic] testimony from yesterday?" Second, the jury asked if they were "limited to a second degree felony, and what does it mean?" Third, the jury asked, "Is assault and battery the same?" As to the first question, the trial court's written response was that "You must rely upon your collective memories as to the testimony of Greg Williams." In response to the second and third questions, the court wrote, "You are limited in your discussion to the charges of felonious assault in which the Court instructed you."
The jury returned a verdict of guilty and appellant was convicted and sentenced to a five-year prison term. Appellant subsequently filed this appeal, raising one assignment of error for our review:
Assignment of Error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT/APPELLANT WHEN IT REFUSED TO INSTRUCT THE JURY ON THE REQUESTED LESSER INCLUDED OFFENSE OF ASSAULT, A MISDEMEANOR OF THE 1ST DEGREE.
Appellant argues that by refusing to instruct the jury on the lesser included offense of assault, the trial court committed reversible error. Appellant insists that the evidence presented by the defense supports a finding that appellant committed only assault and not felonious assault. Therefore, appellant reasons that the trial court should have instructed the jury on the offense of assault.
The distinction between assault as defined by R.C. 2903.13(A) and felonious assault as defined by R.C. 2903.11(A)(1) concerns the amount of harm caused. Appellant was convicted of felonious assault, a violation of R.C. 2903.11(A)(1), which states, "No person shall knowingly * * * cause serious physical harm to another * * *." Appellant requested that the trial court also instruct the jury on assault pursuant to R.C2903.13(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to another * * *." Whereas felonious assault contains the element "serious physical harm," assault requires only "physical harm." Serious physical harm to persons is defined in R.C.2901.01(A)(5) as follows:
 (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 (b) Any physical harm that carries a substantial risk of death;
 (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 (d) Any physical harm that involves some permanent disfigurement, or that involves some temporary, serious disfigurement;
 (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering, or that involves any degree of prolonged or intractable pain.
Assault as defined by R.C. 2903.13(A) is a lesser included offense of felonious assault as defined by R.C. 2903.11(A)(1). State v. Thrasher
(Jan. 21, 1994), Clark App. Nos. 2996, 2997, unreported, 1994 WL 12425, at *2. However, "[e]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." State v. Smith (2000),89 Ohio St.3d 323, 330, quoting State v. Thomas (1988), 40 Ohio St.3d 213, paragraph two of the syllabus.[1] In making this determination, the court must view the evidence in the light most favorable to the defendant. Smith at 331, citing State v. Wilkins (1980),64 Ohio St.2d 382, 388. The Supreme Court of Ohio has explained that [t]he persuasiveness of the evidence regarding the lesser included offense is irrelevant. If under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense, the instruction on the lesser included offense must be given.
State v. Solomon (1981), 66 Ohio St.2d 214, 221, quoting Wilkins at 388.[2]
In reviewing the evidence to determine whether an instruction on a lesser included offense is warranted, however, a court should not create an opportunity for a jury to reach a compromise verdict. The Supreme Court of Ohio has explained:
 Juries are not to be presented with compromise offenses which could not possibly be sustained by the adduced facts. Such unreasonable compromises are detrimental to both the state and the defendant. These compromises allow juries to lessen punishment at their unlimited discretion, even when they find the defendant guilty of the greater offense beyond a reasonable doubt. Further, they can allow juries to convict a defendant of a crime of which he is not guilty beyond a reasonable doubt with a clearer conscience than if only the greater offense were charged.
 Wilkins, 64 Ohio St.2d at 387.
On appeal, appellant contends that the evidence at trial required a jury instruction on the lesser included offense of assault, whereas the state argues that instructing the jury on this offense would have allowed the jury to improperly reach a compromise verdict.
If the jury believed appellant's testimony, it could have found that John-John was responsible for Williams' serious injuries and that appellant had only hit Williams near his eye and in his side, which did not cause any serious physical injury to Williams. If the jury believed appellant's testimony, it could have also found that appellant's involvement ended before John-John began assaulting Williams and had nothing to do with John-John's assault. If so, the jury could have concluded that appellant did not aid and abet a felonious assault.
It is not our duty but the jury's duty to determine the persuasiveness of the evidence presented by the defense. We are bound by the standard of review to view the evidence in a light most favorable to defendant.Smith, 89 Ohio St.3d at 331, citing Wilkins, 64 Ohio St.2d at 388.
Viewing the evidence presented at trial in a light most favorable to appellant, we hold that a jury could reasonably find that appellant committed an assault but not a felonious assault. Therefore, the trial court erred by refusing to grant appellant's request to instruct the jury on the lesser included offense of assault. The assignment of error is well-taken.
The judgment is reversed and this cause is remanded to the trial court for a new trial.
YOUNG, P.J., concurs.
WALSH, J., dissents.
[1] The dissent cites Thomas at paragraph three of the syllabus for the proposition that "[a] jury is only permitted to consider a lesser included offense if it cannot adjudge the defendant guilty of the greater offense." This statement of law applies only to a jury's deliberation after a court has already instructed the jury on a lesser included offense. The issue here, however, is whether the trial court was required to instruct the jury on the lesser included offense in the first place.
[2] Citing State v. Shane (1992), 63 Ohio St.3d 630, 632, the dissent states the following:
 A mere conflict in testimony does not require that an instruction on a lesser included offense be given. To require that an instruction be given to the jury "every time `some evidence,' however minute, is presented going to a lesser included * * * offense would mean that no trial judge could ever refuse to give an instruction on a lesser included * * * offense."
Although not quoted by the dissent, the Shane decision also states that:
 The `some evidence' referred to in those cases is simply an abbreviated way of saying that a jury instruction must be given on a lesser included (or inferior-degree) offense when sufficient evidence is presented which would allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense. * * * The jury would be unduly confused if it had to consider the option of guilty on a lesser included (or inferior-degree) offense when it could not reasonably return such a verdict." (Emphasis added.)
Instead of considering the sufficiency of the testimony given at trial, the dissent, in its analysis, improperly weighs the testimony.