DECISION AND JUDGMENT ENTRY
This death penalty case comes to us on direct appeal from the Lucas County Court of Common Pleas following a judgment entry on a guilty verdict against appellant, Timothy L. Hoffner. For the reasons that follow, we find that the judgment of the Lucas County Court of Common Pleas should be affirmed.
Appellant was indicted for and found guilty of three counts of aggravated murder with death penalty specifications, kidnaping, aggravated robbery, and three counts of forgery. These charges stem from the disappearance and death of Christopher Hammer. Hammer's body had been found buried in the woods in Lucas County. The coroner ruled that Hammer had died of asphyxiation; he had been buried alive.
Christopher Hammer was reported missing by his mother, Barbara Hammer, on or about September 30, 1993. Mrs. Hammer also reported that, shortly before his disappearance, her son had been living in a home at 3624 McGregor Lane with Archie Dixon, Kirsten Wilkerson, and appellant. On or about October 25, 1993, Barbara Hammer informed Detective Ron Scanlon of the Toledo police division that her son's friend had reported to her that he saw Christopher Hammer's car at a used car lot in Sylvania Township. On November 8, 1993, Detective Scanlon displayed a photographic line-up to salesmen at the car lot, and two of the salesmen identified Archie Dixon as the man who sold them Christopher Hammer's car. Officers then obtained a search warrant for the home on McGregor Lane and an arrest warrant for Archie Dixon for forgery. A group of approximately eleven officers, some uni formed, some not, executed the search warrant at approximately 11:00 a.m. on November 9, 1993. Because appellant's first two assignments of error are directed toward this search, we will recite in detail the facts relating to the search. These facts are derived from the testimony given at the hearings on two motions to suppress evidence.
When Lieutenant Charles Hunt of the Toledo police division entered the family room of the McGregor Lane home on the day of the search, he found appellant laying on a couch with a blanket over him. It appeared to Lt. Hunt that appellant had been sleeping. With his gun pointed in the air, Lt. Hunt ordered appellant to get off the couch and to put his hands in the air. Lt. Hunt pulled the blanket off with his left hand, holstered his gun, and patted down appellant. Lt. Hunt instructed appellant to sit in a chair in the family room. Upon appellant's request, officers permitted appellant to smoke cigarettes while the officers searched the room. Lt. Hunt testified that appellant never asked to eat or to use the restroom. According to Lt. Hunt, officers asked appellant if he knew where Christopher Hammer was or where Hammer's property was. Lt. Hunt also testi fied that officers told appellant that if he was not involved in Hammer's disappearance he had nothing to worry about. At this point, appellant denied having knowledge of Hammer's whereabouts.
Both Lt. Hunt and Detective Robert Leiter testified that during the search, while appellant was seated in a chair in the family room, appellant asked to speak with them. Appellant then began to give the officers information about Hammer's disappearance. Appellant told the officers that, one day some weeks earlier, Dixon had asked appellant and a friend to give Dixon a ride. They drove to a parking lot behind an apartment complex off Alexis Road, and appellant saw Christopher Hammer's car there. Dixon got into Hammer's car, telling appellant and his friend to follow him. Dixon drove to a car dealer on Central Avenue and sold the car. Appellant and the friend then took Dixon to a bank, and they then drove him back to the McGregor Lane home. Appellant also told the officers that sometime later he had been driving around with Dixon, and he asked Dixon if he knew where Hammer was. According to Lt. Hunt, appellant stated to him that Dixon pointed toward a wooded location in the area of Secor and Alexis. Appellant asked Dixon whether Hammer was walking around in the woods, and Dixon replied that Hammer was, indeed, in the woods but that he was not walking around. Accord ing to appellant, Dixon said that he had gotten into an argument with Hammer and that he "took care of him." Appellant had not been given his Miranda
rights at this time, and the officers both testified that they considered appellant merely a witness at this point. At no time during the search was appellant restrained or restricted in his movement.
At some point during the search, Detective Scoble of the Toledo Police Division approached appellant in the family room of the home and asked appellant who owned the Firebird parked in the driveway. Appellant stated that he (appellant) owned it. Detective Scoble testified that he asked appellant for his permission to search the car, and appellant consented to the search. Appellant and Detective Scoble proceeded to the car, where they were met by Detective Scanlon. Before the detectives searched the car, they presented a consent form to appellant, which appellant willingly signed. Detectives Scoble and Scanlon testified that appellant read the form before signing it, that he appeared to understand it, and that they did not coerce him or issue any threats or promises to induce appellant to sign the form. Appellant was not restrained in any fashion during the search of his car. After obtaining appellant's oral and written consent, Detectives Scoble and Scanlon searched his car. They seized, among other things, a pair of tennis shoes from the trunk.
After appellant made the above-described statements to the police, and after the police searched appellant's car, Detective Leiter and Lt. Hunt asked appellant if he would go downtown with them to make a statement. Appellant agreed. Again he was not restrained in any way, and his freedom of movement was not restricted. Detective Leiter testified that, on the drive downtown, he stated to appellant that the police were going to have to search the entire wooded area that appellant had indi cated was the grave site, and if he (appellant) had any other information, that information would be helpful to the police. Appellant stated that he had no other information. Detective Leiter testified that he asked appellant if he had any involvement in the disappearance of Hammer, and appellant responded that he did not. When Lt. Hunt had driven nearly the entire way downtown, appellant asked him to pull the car over. When Lt. Hunt pulled the car over, appellant stated that he had to talk to the officers about something. According to Detective Leiter and Lt. Hunt, appellant then stated that Dixon had shown him where he had buried Hammer. Appellant also stated that the day after Dixon had shown him the grave site, he (appellant) returned to that spot in the light of day and observed that the ground looked like it had been dug up and filled back in. He agreed to take the officers to the grave site.
The officers drove toward the area of the grave site and appellant directed the officers past a couple of paths before identifying one as the right path. Though several other officers were in tow at this time, appellant stated that he only wanted Hunt and Leiter with him. Appellant walked quickly down the path ahead of the officers and was, at certain times, outside the officers' sight. After appellant identified the grave site, Detective Leiter took appellant back to the car. Subsequently, Hunt returned to the police car as well, and after speaking with Detectives Leiter and Scanlon, he learned that appellant had agreed to go downtown to make a statement as to the information he had provided to the officers. Appellant was not restrained at this time, and he had not, at this time, been read his Miranda rights.
At about 3:30 p.m. on November 9, 1993, appellant accompanied the officers to the safety building to make a state ment. He was not under arrest. Nevertheless, Detective Leiter advised appellant of his rights pursuant to Miranda v. Arizona (1966), 384 U.S. 486. Detective Leiter testified that, with a tape recorder running, he presented a waiver of rights form to appellant and went over the entire form with him paragraph by paragraph. Detective Leiter asked appellant if he was under the influence of alcohol or drugs, and appellant replied that he was not. At the conclusion of this exchange, appellant confirmed that he understood his rights and wished to give a statement. He did not want a lawyer. He then gave a taped statement to the police, never asking during the process to end the statement or to get a lawyer. After taking appellant's statement, Detectives Leiter and Kulakoski drove appellant back to the home on McGregor Lane, where he gathered his belongings and proceeded to his mother's house in Perrysburg, Ohio.
After taking statements from Archie Dixon (who by this time had been arrested and was being held in the county jail) and from Kirsten Wilkerson, and upon the advice of the county prose cutor's office, officers obtained a warrant for appellant's arrest. He was arrested without incident at his mother's home shortly after midnight on November 10, 1993.
After his arrest, Toledo police officers took appellant to the downtown police station. Appellant was placed in front of Detective Leiter's desk and Detective Leiter sat behind his desk. Detective Kulakoski was the only other person present in the room. Appellant's handcuffs were removed. He was given a beverage and offered a chance to use the restroom. Appellant was again advised of his Miranda rights and, according to Detective Kulakoski, appellant initially stated that he did not wish to give a statement. Subsequently, however, appellant did give a taped statement. Before the statement began, Detective Leiter, on tape, reviewed the waiver of rights form with appellant, again reading it paragraph by paragraph, and appellant stated that he understood his rights. He then gave a statement confessing to his involvement in Christopher Hammer's death.
On March 1, 1994, appellant moved to suppress the statements he made to the police on November 9, 1993 and in the early morning hours of November 10, 1993. On September 30, 1994, he also moved to suppress evidence of the tennis shoes recovered during the search of his car on November 9, 1993. In an opinion file-stamped January 23, 1995, and following hearings on April 12, 1994, April 28, 1994, April 29, 1994, May 3, 1994, June 1, 1994, and January 5, 1995, the trial court denied both motions.
Appellant's trial began on May 15, 1995, and concluded on May 20, 1995 with a guilty verdict on all charges and specifi cations. Following the mitigation (or "penalty") phase, the jury recommended the death penalty. On June 1, 1995, the trial court filed its judgment entry of sentence. As to Count I, aggravated murder with prior design and calculation and two death penalty specifications, the trial court accepted the jury's recommenda tion of death. Accordingly, the court ordered appellant conveyed to prison and ordered that a writ of execution of the death penalty be issued. The judge did not impose sentence on Counts II and III, aggravated murder during the course of a specific felony, namely kidnaping (Count II), and aggravated robbery (Count III), finding these charges to be allied offenses of similar import under R.C. 2941.25(A). The trial court sentenced appellant on the remaining charges as follows: (1) as to Count IV, kidnaping, the court sentenced appellant to a period of incarceration of ten to twenty-five years; (2) as to Count V, aggravated robbery, the court sentenced appellant to a period of incarceration of ten to twenty-five years; and (3) as to Counts VI, VII, and VIII, forgery, the trial court ordered appellant to serve periods of incarceration of one and one-half years on each count. The sentences in Counts IV though VIII were ordered to be served consecutively.
On June 7, 1995, the trial court filed its opinion and judgment entry pursuant to R.C. 2929.03(F), making specific findings as to both the aggravating circumstances and the miti gating factors and the reasons why the aggravating circumstances outweighed the mitigating factors. This appeal followed. On appeal, appellant sets forth the following fourteen assignments of error:
"FIRST ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. HOFFNER BY DENYING HIS MOTION TO SUP PRESS ORAL STATEMENTS TO POLICE OFFICERS TAKEN IN VIOLATION OF HIS DUE PROCESS RIGHTS GUARANTEED UNDER THE FIFTH, SIXTH, AND FOUR TEENTH AMENDMENTS TO THE UNITED STATES CON STITUTION AND THE OHIO CONSTITUTION.
"SECOND ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF MR.
HOFFNER BY DENYING HIS MOTION TO SUP PRESS THE SEARCH OF HIS AUTOMOBILE WHERE THAT SEARCH WAS THE RESULT OF A WAIVER OF COUNSEL AND THE WAIVER OF A SEARCH WARRANT TAKEN IN VIOLATION OF HIS FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE APPLICABLE PORTIONS OF THE OHIO CONSTITUTION.
"THIRD ASSIGNMENT OF ERROR
 "MR. HOFFNER WAS DENIED HIS DUE PROCESS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DUE TO THE ACTIONS OF HIS TRIAL COUNSEL THAT FELL BELOW ANY ACCEPTED STANDARD OF COMPETENCE IN VIOLA TION OF HIS FIFTH, SIXTH, EIGHTH AND FOUR TEENTH AMENDMENTS TO THE UNITED STATES CON STITUTION AND THE OHIO CONSTITUTION.
"FOURTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN FAILING TO ASK APPELLANT WHETHER HE (1) WAS AWARE THAT HE HAD AN ABSOLUTE RIGHT TO TESTIFY IN HIS OWN BEHALF, AND (2) KNOWINGLY, INTELLIGENTLY, AND PERSONALLY WAIVED THAT RIGHT.
"FIFTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. HOFFNER AND VIOLATED HIS DUE PROCESS RIGHTS BY INFORMING THE JURY THAT THE ISSUE OF PUNISHMENT IS ULTIMATELY FOR THE COURT AND NOT THE JURY.
"SIXTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. HOFFNER AND VIOLATED HIS RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN THE STATE IS PERMITTED TO CONVICT UPON A STANDARD OF PROOF BELOW PROOF BEYOND A REASONABLE DOUBT.
"SEVENTH ASSIGNMENT OF ERROR
 "THE OHIO SUPREME COURT'S DECISION ON STATE V. McGUIRE IMPROPERLY RESTRICTS THIS COURT IN ITS ABILITY TO CONDUCT AN INDEPENDENT ANALY SIS OF THE APPROPRIATENESS OF THE DEATH PEN ALTY IN THIS CASE.
"EIGHTH ASSIGNMENT OF ERROR
 "THE JURY AND TRIAL COURT VIOLATED ITS DUTY AND ALSO THE CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE OF OHIO BY IMPOSING A SENTENCE OF DEATH BY MISWEIGHING AGGRAVATING CIRCUMSTANCES AGAINST MITIGATING FACTORS AND BY WEIGHING THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AGAINST THE MITIGATING FACTORS.
"NINTH ASSIGNMENT OF ERROR
 "INSOFAR AS ANY OF THE ERRORS COMPLAINED OF HEREIN ARE DEEMED NOT TO HAVE BEEN PRESERVED PROPERLY BY TRIAL COUNSEL, COUNSEL PROVIDED APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE IS CONSTITUTIONALLY ENTITLED.
"TENTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN VIOLATION OF APPEL LANT'S RIGHTS UNDER THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF OHIO WHEN IT REFUSED HIS MOTION TO DISMISS THE DEATH SPEC IFICATIONS.
"ELEVENTH ASSIGNMENT OF ERROR
 "THE REQUIREMENT IMPOSED BY THE SUPREME COURT OF OHIO THAT MANDATED PROPORTIONALITY REVIEW OF DEATH SENTENCES INCLUDE IN THE SAMPLE TO BE REVIEWED ONLY THOSE CASES WHERE THE PUN ISHMENT OF DEATH WAS IMPOSED IS DEFECTIVE AND WRONG IN THEORY AND IN PRACTICE AND DENIES A CAPITALLY SENTENCED PERSON HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, NINTH AND FOUR TEENTH AMENDMENTS TO THE UNITED STATES CON STITUTION AND UNDER SECTIONS 1, 2, 5, 9, 10, 16, AND 20, ARTICLE I OF THE OHIO CONSTITU TION.
"TWELFTH ASSIGNMENT OF ERROR
 "A DEATH PENALTY LAW WHICH HAS NOT BEEN EN FORCED EXCEPT IN THE CASE OF A `VOLUNTEER' IN OVER THIRTY FIVE YEARS IS, BY DEFINITION[,] CRUEL AND UNUSUAL AND IN THIS CASE CAN ONLY BE VIEWED AS FREAKISH, CAPRICIOUS, AND ARBI TRARY.
"THIRTEENTH ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN CONCLUDING THAT THE AGGRAVATING CIRCUMSTANCE, THAT THE AGGRAVATED MURDER IN THIS CASE WAS COMMITTED IN THE COURSE OF AN AGGRAVATED ROBBERY AND THAT THE DEFENDANT WAS THE PRINCIPAL OFFENDER IN THE AGGRAVATED MURDER, OUTWEIGHED THE MITIGATING FACTORS BEYOND A REASONABLE DOUBT.
"FOURTEENTH ASSIGNMENT OP ERROR
 THE DEATH SENTENCE IN THIS CASE IS NEITHER APPROPRIATE NOR IN PROPORTION TO THE DEATH SENTENCE IN OTHER CASES."
Pursuant to R.C. 2929.05(A), we will first address the assignments of error. We will then independently weigh the aggravating circumstances against the mitigating factors. Finally, we will independently review whether appellant's sen tence is appropriate and proportionate to the penalties in similar cases.
I. THE ASSIGNMENTS OF ERROR
A. ALLEGED PRE-TRIAL ERRORS
1. The Motions to Suppress
In his first two assignments of error, appellant contends that the trial court erred in denying his motion to suppress the statements he made to the police on November 9, 1993 and in the early morning hours of November 10, 1993, and that the trial court erred in denying his motion to suppress physical evidence, i.e., the tennis shoes seized following the search of appellant's car. Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. State v.Davis (1999), 133 Ohio App.3d 114, 117. Since a trial court deciding the motion to suppress acts as a fact-finder, an appel late court must accept the trial court's findings of fact as true if supported by competent, credible evidence. State v. Kobi (1997), 122 Ohio App.3d 160, 167-168. However, an appellate court reviews de novo the trial court's application of the law to the facts. Id.
Appellant contends that his first statement to police, during the execution of the search warrant at the McGregor Lane residence, was inadmissible at trial because appellant gave the statement without the benefit of having been advised of his Miranda rights. According to appellant, since police should not have taken his statement without advising him of his constitu tional rights under Miranda, that statement tainted all of the subsequent statements and the subsequent search of his car; in other words, the subsequent statements and the search became "fruit of the poisonous tree" pursuant to United States Supreme Court law as announced in Wong Sun v. United States (1963), 371 U.S. 471.
The Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Consti tution guarantee individuals the right against self-incrimina tion. In addition, the Sixth andFourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee to individuals the right to counsel in criminal matters. Though these rights may be waived by an individual, they may only be waived upon a showing that the waiver was intelligent, knowing, and voluntary. Miranda, 384 U.S. at 444. See, also, Miranda, 384 U.S. at 475 (if police take a statement without advising the accused of his rights, a "heavy burden" rests on the state to show that the waiver was knowing, intelligent, and voluntary). Accordingly, the United States Supreme Court has held that the state may not introduce at trial statements of an accused unless the accused was advised of his constitutional rights to counsel and against self-incrimination and the accused effectively waived these rights. Id.
at 475.
However, law enforcement officials need not advise every accused person of these rights: the United States Supreme Court has held that law enforcement officials need only inform the accused of his rights when the accused is subject to custo dial interrogation. Id. The Supreme Court in Miranda defined "custodial interrogation" as "* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Moreover, law enforcement officials need not give warnings where the accused volunteers the statements without questioning.Miranda, 384 U.S. at 479 ("[t]he fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.")
The definition of "in custody" has developed since Miranda was first announced. In a subsequent case, the United States Supreme Court held that a person is in custody for Miranda purposes when a reasonable person in the suspect's situation would view the situation as being custodial.Berkemer v. McCarty (1984), 468 U.S. 420, 442. The Supreme Court inBerkemer stated, "A policeman's unarticulated plan has no bearing on the question whether a suspect in `in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's posi tion would have understood the situation." Id. Since Berkemer, courts have regularly applied the "reasonable person" standard to determine whether a suspect is in custody. See, e.g., State v. Mason (1998),82 Ohio St.3d 144, 154; State v. Wilson (1991), 76 Ohio App.3d 519, 522;State v. Healy (Aug. 4, 2000), Montgomery App. No. 18232, unreported.
In this case, in ruling on the motion to suppress, the court found that appellant was not in custody for Miranda purposes until his arrest just after midnight on November 10, 1993. Further, the trial court found that the statements appellant made before the police informed him of hisMiranda rights were made voluntarily. Because appellant was not in custody when he made the November 9 statements, and because appellant made the statements voluntarily, the trial court held that the officer's failure to inform appellant of his Miranda rights was of no consequence. With regard to the search of appellant's car, the trial court again found that appellant voluntarily consented to the search after the officers "painstakingly" led appellant through the vehicle search waiver form. Accordingly, the trial court found no basis on which to suppress the statements or the evidence of the tennis shoes.
We agree with the trial court. As to appellant's initial statements during the execution of the search warrant, it is clear that appellant was not "in custody" for Miranda purposes. A reasonable person may not have felt free to leave at the beginning of the search, when officers, at least two with guns drawn, checked the house for weapons. However, the testi mony at the hearing was that this period of time was short, and that the two officers who had their guns drawn had them drawn for only a matter of minutes.[1] Appellant did not make any statements during the weapons search. Once the weapons search was com pleted, the circumstances at the house for the remainder of the search would not have led a reasonable person to conclude that he was not free to go. In appellant's case, he was never told that he could not leave, he was not restrained in any way, and no guns were drawn after the initial weapons check. Though officers told appellant to be seated on a chair during the search, they did so only so that people were not wandering around the house during the search disturbing potential evidence or getting in the way of the police officers as they conducted the search. There is no evidence that appellant was told to not leave the chair.
Even if we were to conclude that appellant was in custody for Miranda
purposes during the execution of the search warrant, it is clear from the record that the statements appel lant made to police officers during that time were voluntary. Appellant asked to speak with Hunt and Leiter, at which time he voluntarily offered information about Dixon selling Christopher Hammer's car and about Dixon "taking care of" Hammer and burying him in the woods. Since appellant volunteered this information and it was not given in response to police questioning, the officers' failure to inform appellant of his Miranda rights during the execution of the search warrant would not make appel lant's statements inadmissible.[2] See Miranda, 384 U.S. at 479.
Similarly, appellant was not in custody for Miranda purposes when he made statements to police in the police car immediately following the execution of the search warrant and when he led police to the grave site. The record shows that appellant voluntarily agreed to go to the police station to give a statement. He was not handcuffed or restrained in any way. He was not told that he was under arrest. Further, when leading police to the grave site, appellant was actually some distance ahead of police, out of their sight. Under those circumstances, a reasonable person would not have believed that he was under arrest. Since appellant was not in custody for Miranda purposes, the police were not required to inform him of his Miranda rights at that time.
Even if appellant was in custody for Miranda purposes when he made statements to the police en route to the police station and while leading police to the grave site, officers still would not have been required to inform appellant of his rights since appellant made the statements voluntarily. As stated earlier, Hunt and Leiter (apparently mostly Leiter) were talking casually with appellant in the police car en route
to downtown. Detective Leiter told appellant that the police were going to have to search all of the woods for the grave site, so any other information he had would be helpful. The detectives also testified that they asked appellant the same questions they asked him at the McGregor Lane house: whether he had any in volvement in the disappearance of Christopher Hammer or whether he disposed of any evidence having to do with the disappearance of Christopher Hammer. Appellant answered that he did not. At some point in this conversation, appellant volunteered that he had additional information but did not want to get into trouble. The officers stated to appellant that he could be guilty of "obstructing" if he withheld information and that, as long as he was truthful and had no involvement in Hammer's disappearance, he had nothing to worry about. As the police car was exiting the freeway, appellant told the officers to pull over, that he had something to tell them. He then told the officers about, and led them to, the grave site. Since appellant gave this information voluntarily, the fact that officers had not at that time informed him of his Miranda rights does not render the statements inadmissible. See Miranda, 484 U.S. at 479.
Appellant gave his remaining statements, one in the afternoon of November 9, 1993, and one following his arrest just after midnight on November 10, 1993, after he had been informed of his rights and he waived them. Appellant does not argue that these rights were not knowingly and voluntarily waived. There fore, for all of the reasons explained above, we find that the trial court did not err in denying appellant's motion to suppress his statements.
Appellant also appeals the trial court's denial of his motion to suppress physical evidence, i.e., the tennis shoes found in the trunk of appellant's car. The trial court held that appellant knowingly and voluntarily waived his rights and con sented to a search of the car. The record amply supports that decision. Further, since the search of the car was not "tainted" by earlier illegal or unconstitutional searches, evidence result ing from the search of appellant's car was admissible. There fore, appellant's first and second assignments of error are found not well-taken.
2. THE MOTION TO DISMISS
Appellant contends in his tenth assignment of error that the trial court erred in denying appellant's motion to dismiss the death penalty specifications. Essentially, appellant claims that the death penalty is unconstitutional. The Supreme Court of Ohio has, on many occasions, found the death penalty to be constitutional. See, e.g., State v.Stallings (2000), 89 Ohio St.3d 280, 297; State v. Evans (1992),63 Ohio St.3d 231, 253-254, rehearing denied (1992), 63 Ohio St.3d 1450, certiorari denied (1992), 506 U.S. 886. Accordingly, appellant's tenth assignment of error is found not well-taken.
B. ALLEGED TRIAL ERRORS
In his fourth, fifth, sixth, eighth, and thirteenth assignments of error, appellant argues that the trial court erred during the trial. We shall address these assignments of error seriatim.
In his fourth assignment of error, appellant contends that the trial court erred in failing to inquire of appellant whether he was aware that he had an "absolute right" to testify on his own behalf and in failing to ensure that appellant know ingly, intelligently, and personally waived that right. In failing to do so, according to appellant, the trial court vio lated appellant's "rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and under Section 9, Article I of the Ohio Constitution." Since appellant did not raise this alleged error at trial, appellant has waived it unless it amounts to plain error. State v. Waddell (1996),75 Ohio St.3d 163, 166; State v. Joseph (1995), 73 Ohio St.3d 450, 455, reconsideration denied (1995), 74 Ohio St.3d 1423, certiorari denied (1996), 516 U.S. 1178. In order to warrant reversal based on plain error, the error must be such that, but for the error, the outcome of the trial would have clearly been different. Id.; Waddell,75 Ohio St.3d at 166.
The law is settled that a trial court is not required to advise a criminal defendant of his right to testify on his own behalf and is not required to inquire of a defendant as to his decision not to do so.State v. Bey (1999), 85 Ohio St.3d 487, 499-500, reconsideration denied (1999), 85 Ohio St.3d 1502, certiorari denied (1999), 528 U.S. 1049. See, also, State v. Campbell (2000), 90 Ohio St.3d 320, 326. Therefore, the trial court did not commit error, let alone plain error, in failing to advise appellant of these rights. Appellant's fourth assignment of error is found not well-taken.
In his fifth assignment of error, appellant argues that the trial court erred in informing the jury that punishment was ultimately a decision for the court. Specifically, the court stated,
 "In reaching your verdict, you may not dis cuss or consider the subject of punishment. Your duty is confined to the determination of the guilt or innocence of the Defendant. In the event you find the Defendant guilty, the duty to determine the proper punishment is placed by law, ultimately, on the Court."
Since appellant did not object to this instruction at trial, this assignment of error is waived unless the instruction amounted to plain error. Waddell, 75 Ohio St.3d at 166; Joseph,73 Ohio St.3d at 455.
Appellant analogizes this case to cases where the trial court and/or the prosecutor indicated that the jury's verdict on the penalty was merely a "recommendation." In this case, the instruction quoted above was made at the close of the guilt phase, not the penalty phase, and the court did not use the word "recommendation." Nevertheless, assuming that appellant is arguing that the jury would have construed this comment as indicating that their verdict was merely a recommendation and that they remembered and applied this instruction in the penalty phase, the trial court did not commit error, let alone plain error. The Supreme Court of Ohio has repeatedly permitted this sort of language. See, e.g.,Stallings, 89 Ohio St.3d at 295-296; State v. Keith (1997),79 Ohio St.3d 514, 518, reconsideration denied (1997), 80 Ohio St.3d 1450, certiorari denied (1998), 528 U.S. 1063; Evans, 63 Ohio St.3d at 253. Accordingly, appellant's fifth assignment of error is found not well-taken.
In his sixth assignment of error, appellant argues that his constitutional rights under the Fourth Amendment to the United States Constitution were violated when the jury was allowed to convict on a standard of proof "below proof beyond a reasonable doubt." The trial court, instructing the jury follow ing both the guilt phase and the penalty phase, employed the "reasonable doubt" language found in R.C.2901.05(D). That section provides,
 "(D) `Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evi dence is open to some possible or imaginary doubt. `Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs."
During the penalty phase, the trial court also instructed the jury:
 "As to these aggravating circumstances, the prosecutor has the burden to prove beyond a reasonable doubt that the aggravating circum stances of which the Defendant was found guilty outweigh the factors in mitigation of imposing the death sentence."
"* * *.
 "Now, recall from the trial phase of this case that reasonable doubt is present when, after you have carefully considered and com pared all of the evidence, you cannot say you are firmly convinced of the truth of the matters sought to be proved, here that the aggravating circumstances outweigh the miti gating factors."
Since appellant did not object to this instruction at trial, the alleged error is waived unless it amounts to plain error. Waddell,75 Ohio St.3d at 166.
The Supreme Court of Ohio has approved of the statutory definition of reasonable doubt quoted above, noting that the definition properly conveys to the jury the concept of reasonable doubt, and the definition is not an "unconstitutional dilution" of the state's obligation to prove guilt beyond a reasonable doubt. See State v. Nabozny (1978),54 Ohio St.2d 195, paragraph two of the syllabus. See, also, State v.Gundy (1992), 64 Ohio St.3d 230 . However, the Supreme Court has expressed some concern with the use of this definition in the penalty phase of capital cases. See State v. Goff (1998), 82 Ohio St.3d 123, 132, reconsideration denied (1998), 82 Ohio St.3d 1483, certiorari denied (1999), 527 U.S. 1039. Nevertheless, the court in Goff determined that the definition was generally acceptable, and empha sized that "an appropriate penalty-phase instruction on the issue of reasonable doubt should convey to jurors that they must be firmly convinced that the aggravating circumstance(s) outweigh the mitigating factor(s), if any."Id. In Goff, when the Court considered all of the penalty phase instructions together, it found no prejudicial error in the trial court having given the statutory definition of reasonable doubt.
In this case, the trial court gave the instructions informing the jury that the state had the burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors and that, in this particular case, reason able doubt exists if "* * * you cannot say you are firmly convinced of the truth of the matters sought to be proved, here that the aggravating circumstances outweigh the mitigating factors." These instructions, taken together, fully comport with Ohio Supreme Court law as announced in Nabozny and its progeny, includingGoff. Accordingly, appellant's sixth assignment of error is found not well-taken.
In his eighth assignment of error appellant contends that the jury and the trial court erred by misweighing the aggravating circumstances and the mitigating factors. Specifi cally, appellant contends that the trial court erred by: (1) weighing the aggravating circumstances against the mitigating factors individually instead of collectively, and (2) by treating the nature and the circumstances of the offense as aggravating circumstances. R.C. 2929.04(A) provides a list of eight aggra vating circumstances, only one of which applies in this case: R.C.2929.04(A)(7),[3] which provides that an aggravating circumstance exists where:
 "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggra vated arson, aggravated robbery, or aggra vated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the princi pal offender, committed the aggravated murder with prior design or calculation."
According to R.C. 2929.04(B):
 "If one or more of the aggravating circum stances listed in division (A) of this sec tion is specified in the indictment or count in the indictment and proved beyond a reason able doubt, and if the offender did not raise the matter of age pursuant to section 2929.023 * * * or if the offender, after raising the matter of age, was found at trial to have been eighteen years of age or older at the time of the commission of the offense, the court, trial jury, or panel of three judges shall consider, and weigh against the aggra vating circumstances proved beyond a reason able doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
 "(1) Whether the victim of the offense induced or facilitated it;
 "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capac ity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
"(4) The youth of the offender;
 "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
In other words, the trial court and the jury are to weigh the aggravating circumstance(s) proved beyond a reasonable doubt against: (1) the nature of circumstances of the offense; (2) the defendant's history, character, and background; and (3) the seven separately enumerated mitigating factors set out in R.C. 2929.04(B). Addressing appellant's second argument, appellant is correct that the nature and circumstances of the offense are to be weighed on the side of mitigation, if, indeed, the nature and circumstances of the offense have any mitigating value.State v. Wogenshtahl (1996), 75 Ohio St.3d 344, paragraph two of the syllabus, 354-355, reconsideration denied (1996), 75 Ohio St.3d 1453 . See, also, State v. Steffen (1987), 31 Ohio St.3d 111, 117, certiorari denied (1988), 485 U.S. 916; State v. Green (2000), 90 Ohio St.3d 352,362. However, appellant is incorrect in arguing that the trial court used the nature and circumstances of the offense as aggravating circumstances instead of mitigating factors. The trial court never stated that the nature and circumstances of the offense were aggravating circumstances. Though the court commented on the "depraved, violent, and calcu lated" crime against the victim, we understand this comment to mean that the trial court considered the nature and circumstances of the offense and found no mitigating value in them. The trial court is required by R.C. 2929.04(B) to make this inquiry. The Ohio Supreme Court considered this question in Steffen, in which it stated:
 "Nor do we find error in the trial court's consideration of the nature and circumstances of the offense. R.C. 2929.04(B) provides that the court, in determining whether death is an appropriate penalty, `shall consider, and weigh against the aggravating circum stances proved beyond a reasonable doubt, the nature and circumstances of the offense * * *.' (Emphasis added.) Thus, the court is required to review this factor. However, appellant appears to contend that the trial court's remarks on this subject reveal that it viewed the nature and circumstances of the offense herein as aggravating rather than mitigating as required by R.C. 2929.04(B). We do not agree. The statute merely requires that the court consider this factor in determining the mitigating factors to be weighed against the proven aggravating circumstances. Obviously, the nature and circumstances of certain
 offenses will be such that no mitigating feature can be extracted. By its statement on the gruesome and vicious nature of the mur der, the trial court herein was merely justi fying its conclusion that no mitigating fac tors can be gleaned from the nature and cir cumstances of this particular offense. We find nothing improper in the court's remarks." (Footnote omitted.) (Second emphasis added.) Steffen, 31 Ohio St.3d at 117.
We find that the trial court did not err in considering and weighing the nature and circumstances of the offense.[4]
Appellant also argues that the trial court weighed the aggravating circumstances against the mitigating factors sepa rately instead of considering the mitigating factors as a whole. We disagree. The court stated in its opinion, "It was, and is the conclusion of this Court that the aggravating circumstances so clearly demonstrated by the evidence at trial, far, far outweighed the modest cumulative mitigating factors presented in this case * * *." (Emphasis added.) Obviously, then, the trial court considered the mitigating factors as a whole. We find appellant's eighth assignment of error not well-taken.[5]
In his thirteenth assignment of error, appellant contends that the trial court erred in finding that the aggravat ing circumstances outweighed the mitigating factors. As we are required by statute to independently weigh the aggravating circumstances and the mitigating factors, see R.C. 2929.05(A), we will address this assignment of error in Section II.
C. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS
Appellant contends in his third and ninth assignments of error that his trial counsel was ineffective. Appellant argues in his third assignment of error that trial counsel was ineffective in: (1) failing to file a post-hearing brief after the hearings on the motions to suppress; (2) making an "extremely brief" opening statement in the guilt phase of the trial, during which defense counsel did not refer to the evidence or the defense and described the crime as "horrific" and "a terrible tragedy"; (3) referring to the crime as a "horrible event" during the cross-examination of Kirsten Wilkerson; (4) asking no ques tions or asking limited questions during the cross-examination of the state's witnesses; (5) waiving closing argument at the end of the guilt phase; and (6) commenting during closing argument of the mitigation phase that this was a "heinous crime," that defense counsel felt no sympathy for appellant and that, in fact, defense counsel felt "revulsion and confusion in equal parts * * *."
The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. According to the Supreme Court:
 "Counsel's performance will not be deemed ineffective unless and until counsel's per formance is proved to have fallen below an objective standard of reasonable representa tion and, in addition, prejudice arises from counsel's performance." State v. Bradley
(1989), 42 Ohio St.3d 136, at paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011, citing State v. Lytle (1976), 48 Ohio St.2d 391; Strickland v. Washington (1984), 466 U.S. 668.
The court must defer to the strong presumption that counsel's performance falls within the wide range of reasonable profes sional performance.Bradley, 42 Ohio St.3d at 142. Even if counsel's performance falls outside the objective standard of reasonable representation, the court shall not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice warranting reversal, the defendant must show that there is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland, 466 U.S. at 694.
The Court in Bradley derived guidance from the Strickland decision on how to proceed with the two-part analysis for ineffective assistance claims. In Strickland, the United States Supreme Court stated:
 "Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no rea son for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both compo nents of the inquiry if the defendant makes an insufficient showing on one. In particu lar, a court need not determine whether coun sel's performance was deficient before exam ining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, quoted in Bradley, 42 Ohio St.3d at 143.
First, appellant claims that trial counsel was ineffective in failing to file a post-hearing brief following the motions to suppress. Appellant was well-represented at the hearings, and we agree with appellee that appellant has not pointed to any specific need to have filed a post-hearing brief. Moreover, since the facts and law were so clearly in appellee's favor, we cannot say that counsel's failure to file a brief prejudiced appellant. As to the remaining claimed deficiencies of counsel, we must defer to counsel's judgment in determining trial strategy. See State v. Smith (2000), 89 Ohio St.3d 323, 328, reconsideration denied (2000), 90 Ohio St.3d 1419. Defense counsel would be presumed competent in believing that this case, involving a heinous, shocking, and brutal crime, a confession, and eyewitness testimony, could be won, if at all, in the mitiga tion phase, not the guilt phase. And clearly, to maintain any credibility with the jury, counsel would have had to concede that this was, in fact, a "horrible" crime, a "tragedy." See Campbell, 90 Ohio St.3d at 337. Finding that appellant was not denied effective assistance of counsel on these grounds, appel lant's third assignment of error is found not well-taken.
In his ninth assignment of error, appellant contends that trial counsel was ineffective insofar as trial counsel failed to preserve as error the assignments of error raised on appeal. Three of the alleged errors on this appeal were not properly preserved and were reviewed under the plain error standard of review: (1) Assignment of Error No. 4 (trial court erred in failing to inquire of appellant whether he knew that he had a right to testify and whether he wished to voluntarily relinquish that right); (2) Assignment of Error No. 5 (trial court erred in informing the jury that the issue of punishment was ultimately for the court); and (3) Assignment of Error No. 6 (trial court erred by allowing a verdict on a standard of proof lower than proof beyond a reasonable doubt). Upon review of each of these assignments of error, we found no error, plain or otherwise. Accordingly, trial counsel was not ineffective in failing to preserve them. Appellant's ninth assignment of error is found not well-taken.
D. ALLEGED ERRORS RELATING TO THE DEATH PENALTY
In his seventh, eleventh, twelfth, and fourteenth assignments of error appellant raises certain alleged defects in Ohio death penalty law. In his seventh assignment of error appellant contends that the Ohio Supreme Court decision in State v. McGuire (1997), 80 Ohio St.3d 390, syllabus, reconsideration denied (1998), 81 Ohio St.3d 1433, certiorari denied (1998), 525 U.S. 831, which holds that residual doubt is not a valid mitigat ing factor, improperly restricts this court in its ability to conduct an independent analysis of the propriety of the death penalty. Whether or not the decision improperly restricts us, we cannot rewrite Ohio Supreme Court law. Moreover, though the offense was committed and appellant was tried before McGuire was decided, the Supreme Court of Ohio has held that McGuire applies retroactively. State v. Bey,85 Ohio St.3d at 509. See, also, Smith, 89 Ohio St.3d at 336. Accordingly, appellant's seventh assignment of error is found not well-taken.
In his eleventh assignment of error appellant contends that the court's mandated proportionality review is constitution ally defective in that it only requires review of cases where the death penalty was actually imposed. Since the Supreme Court of Ohio has already considered and rejected this argument, see Steffen, 31 Ohio St.3d at 123-124, we find appellant's eleventh assignment of error not well-taken.
In his twelfth assignment of error appellant contends that, since nobody has been executed in Ohio since 1963 (save for a "volunteer") and since nobody has been executed in Lucas County between 1986 and December 1993, the death penalty in Ohio and in Lucas County is "freakish, capricious, wanton, and unusual." The Supreme Court of Ohio, in a case originating from Lucas County, addressed a nearly identical, if not identical, argument and rejected it. See Bey, 85 Ohio St.3d at 502-503. Since the Supreme Court of Ohio has already found this argument to be without merit, we find appellant's twelfth assignment of error not well-taken.
In his fourteenth assignment of error, appellant contends that his death sentence was not appropriate in that it was not proportionate to penalties given in other cases. Because we are required by statute to review death sentences for appro priateness and proportionality, we will address this assignment of error in Section III.
II. INDEPENDENT WEIGHING OF AGGRAVATING CIRCUMSTANCE(S) AND MITIGATINGFACTORS
In cases where the death penalty was imposed for an offense committed before January 1, 1995, the court of appeals shall review the case and,
 "* * * independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." R.C. 2929.05(A).
In addition to independently weighing the aggravating circum stance(s) and the mitigating factors, we are to review whether the evidence supports the finding that the offender committed the aggravating circumstance(s). Id.
Turning first to the aggravating circumstances, the indictment against appellant included specifications for kidnap ing[6] and aggravated robbery.[7] Therefore, the only statutory aggravated circumstance is found in R.C. 2929.04 (A)(7):
 "The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggra vated arson, aggravated robbery, or aggra vated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the princi pal offender, committed the aggravated murder with prior design or calculation."[8]
Taking into account the elements of kidnaping and aggravated robbery as set out earlier, we find that the aggravat ing circumstance set out in R.C. 2929.04(A)(7) has been proven beyond a reasonable doubt. The undisputed testimony at trial was that appellant and Dixon had planned to "get" Christopher Hammer, supposedly for a drug deal that Hammer had interfered with. They beat him, tied him up, and relieved him of the contents of his wallet: $11 dollars in cash plus a birth certificate, a social security card, and a driver's license. There was also undisputed testimony that appellant and Dixon, after beating Hammer, dis cussed what to do with him and then left together to dig Hammer's grave. They then put Hammer into a car and drove him to a wooded area where they tied him up, put him into a hole the two had dug just an hour or so earlier, and covered him, while alive, with approximately two feet of dirt. Based on the evidence, we find that appellant was the principal offender in this crime or, if not, that the crime was committed with prior design and calcula tion, and we also find that the aggravating circumstance set out in R.C. 2929.04(A)(7) has been proven beyond a reasonable doubt.
Evidence was offered as to the following statutory mitigating factors: (1) appellant's history, character, and background, R.C. 2929.04(B); (2) appellant's relative youth, R.C. 2929.04(B)(4); (3) appellant's lack of a significant criminal record, either as an adult or a juvenile, R.C.2929.04(B)(5); and (4) appellant's psychological state, R.C. 2929.04(B)(7).
With regard to appellant's history, character, and background, the evidence showed that appellant was adopted by his family as an infant when he was, at best, neglected by his birth mother. The evidence also established that appellant presented problems for his parents early on, that he had behavior problems, that he engaged in violent behavior with at least one sibling, and that he was cruel to animals. There was also testimony that appellant and his brother received many beatings at the hands of their father, a man appellant dearly loved who died when appel lant was a teenager, causing appellant terrible grief. Appellant grew up in a family that exhibited, for lack of a better term, survivalistic tendencies, with enough food in two refrigerators and two commercial freezers to last a year and a home heavily guarded with firearms, a security system, and motion detectors. Sally Hoffner Snyder, appellant's mother, testified that they told neighbors not to come over at night without calling first because they might get shot. The children were not often allowed out of the house except for school because their parents feared for their safety. The evidence also showed that appellant abused alcohol in high school, that he did not graduate from high school, and that he was discharged from the military due to a diagnosis of a personality disorder "NOS" (i.e., "not otherwise specified") with anti-social, avoidance, and borderline traits. However, the military physician who examined appellant did not find appellant to be incompetent or suffering from a "severe mental disease or defect," and the examiner stated that appellant was considered "fully responsible for himself and his actions."
Evidence was also offered to prove appellant's relative youth, twenty-one years old at the time of the offense, and his lack of significant criminal record (he had an insignificant juvenile record). Finally, under the "catch-all" provision of R.C. 2929.04(B)(7) ("[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death"), appellant offered and proved evidence of anti-social personality disorder, schizotypal personality disorder, depression, and marijuana and alcohol abuse. There was no evidence (in the legal sense) of schizophrenia or any neurological impairment.
In terms of the weighing process, we are to consider the nature and circumstances of the offense to determine whether they provide any mitigating value. We find that the nature and circumstances of the offense, as outlined earlier, have no mitigating value whatsoever. Therefore, we are left with deter mining whether the aggravating circumstance outweighs the miti gating factors beyond a reasonable doubt. Clearly, it does. The state proved beyond a reasonable doubt that appellant killed Christopher Hammer by burying him alive, and that the murder was done in the course of kidnaping (forcing Hammer into a car and driving him to his grave site) and aggravated robbery (taking $11 in cash and personal papers from Hammer's wallet), all done as the principal offender or, if not, with prior design and calcula tion. Though we give weight to appellant's youth, his horribly unfortunate upbringing, his lack of a significant criminal record, and his psychological diagnoses, we find that the aggra vating circumstance far outweighs the mitigating factors. Accordingly, appellant's thirteenth assignment of error is found not well-taken.
III. PROPORTIONALITY REVIEW
Finally, pursuant to R.C. 2929.05, we are to review appellant's sentence for appropriateness and proportionality. The Supreme Court of Ohio has provided guidelines for us to follow in conducting this proportionality review. According to the Supreme Court:
 "* * * the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed. Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate. * * *. No reviewing court need consider any case where the death pen alty was sought but not obtained or where the death sentence could have been sought but was not." Steffen, 31 Ohio St.3d at 123-124.
Accordingly, we will review our decisions in similar cases in which the death penalty was imposed between 1981 and the time of appellant's sentencing.
Of all of the cases reviewed, none involved murder with both aggravated robbery and kidnaping. However, several involved murder and aggravated robbery. See State v. Barnes (Feb. 15, 1985), Lucas App. No. L-84-058, unreported, affirmed (1986), 25 Ohio St.3d 203; State v. Esparza (Aug. 22, 1986), Lucas App. No. L-84-225, unreported, affirmed (1988),39 Ohio St.3d 8; State v. Clark (Dec. 24, 1986), Lucas App. No. L-84-443, unreported, affirmed (1988), 38 Ohio St.3d 252; State v.Montgomery (Aug. 12, 1988), Lucas App. No. L-86-395, unreported, affirmed (1988), 61 Ohio St.3d 410; State v. Bey (Sept. 19, 1997), Lucas App. No. L-94-003, unreported, affirmed (1999), 85 Ohio St.3d 487; State v. Smith
(Feb. 6, 1998), Lucas App. No. L-94-093, unreported, affirmed (2000),89 Ohio St.3d 323; State v. Baston (Sept. 12, 1997), Lucas App. No. L-95-087, unreported, affirmed (1999), 85 Ohio St.3d 418. Two cases involved murder and kidnaping. See State v. Rogers (Mar. 10, 1984), Lucas App. No. L-82-344, unreported, affirmed (1986), 28 Ohio St.3d 427;State v. Fox (Aug. 7, 1992), Wood App. No. 90-WD-067, unreported, affirmed (1998), 83 Ohio St.3d 514. All of these cases involved an unprovoked murder on an innocent victim, and the death penalty was affirmed in all of them. Like appellant in this case, the defendants inEsparza, Rogers, Smith, and Baston introduced evidence in the mitigation phase of bad upbringing or a troubled childhood. Also like appellant in this case, the defendants in Esparza, Bey, and Fox introduced evidence in mitigation of a personality disorder. The defendant in Smith was diagnosed with an unstable mental condition, and the defendant in Rogers
was mildly retarded and suffered from alcoholism. Upon consideration of these cases, we conclude that the death penalty imposed on appellant was appro priate and proportionate to the penalty imposed in other cases. Accordingly, appellant's fourteenth assignment of error is found not well-taken.
On consideration whereof, this court finds that appel lant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant Timothy Hoffner has an automatic appeal to the Supreme Court of Ohio pursuant to R.C. 2929.05. For that reason, we order the clerk of this court to file a copy of this decision with the Clerk of the Supreme Court of Ohio within fifteen days of the date of this decision in accordance with R.C.2929.05(A). We further order a continuance of the stay of execution of sentence previously granted by this court pending appeal to the Supreme Court of Ohio. Costs to abide final determination by the Supreme Court of Ohio.
Melvin L. Resnick, J., CONCUR.
 _____________________________ Mark L. Pietrykowski, P.J.
[1] Detective Leiter testified that the search for weapons is a "quick cursory" search during which occupants of the house are asked to stay in one place. Further, Lt. Hunt's gun was unholstered only during the weapon search; he holstered it again when he searched appellant for weapons. Similarly, Toledo Police Officer Cherie Bryce testified that her gun was unholstered for "less than a minute."
[2] There was some testimony that, at one point during the search, officers told appellant that they were looking for information relating to Christopher Hammer's disappearance and they asked appellant if he had any information about that. At that time, appellant denied having any information about Hammer's disappearance.
[3] The other aggravating circumstances set out in R.C. former 2929.04(A) are, in pertinent part:
 "(1) The offense was the assassination of the president of the United States or a person in line of succession to the presidency, the governor or lieutenant governor of this state, the president-elect or vice president-elect of the United States, the governor-elect or lieutenant governor-elect of this state, or a candidate for any of the offices described in this division. For purposes of this division, a person is a candidate if the person has been nominated for election according to law, if the person has filed a petition or petitions according to law to have the person's name placed on the ballot in a primary or general election, or if the person campaigns as a write-in candidate in a primary or general election.
"(2) The offense was committed for hire.
 "(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.
 "(4) The offense was committed while the offender was a prisoner in a detention facility * * *.
 "(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.
 "(6) The victim of the offense was a peace officer, as defined in section 2935.01 of the Revised Code, whom the offender had reasonable cause to know or knew to be such, and either the victim, at the time of the commission of the offense, was engaged in his duties, or it was the offender's specific purpose to kill a law enforcement officer as so defined.
"* * *.
 "(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding."
[4] To the extent that the trial court may have erred in considering the nature and circumstances of the offense, any such error may by cured by our own independent weighing of the aggravating circumstance against the mitigating factors. See Green, 90 Ohio St.3d at 363; State v. Fox
(1994), 69 Ohio St.3d 183, 190-191, reconsideration denied (1994),69 Ohio St.3d 1483.
[5] Appellant also argues in the eighth assignment of error that the court ignored certain mitigating factors, such as the fact that appellant "operates at a significantly below average range of intelligence and cognitive reasoning." The record simply does not bear out appellant's assertion that he operates "significantly below average range of intelligence* * *." As to his cognitive reasoning, the trial court did consider and weigh appellant's psychological disorders that would affect his thinking processes.
[6] Kidnaping is defined in former R.C. 2905.01 as follows:
 "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where he is found or restrain him of his liberty for any of the following purposes:
(1) To hold for ransom, or as a shield or hostage;
 (2) To facilitate the commission of any felony or flight thereafter;
 (3) To terrorize, or to inflict serious physical harm on the victim or another;
 (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against his will;
 (5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority.
 (B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim:
 (1) Remove another from the place where the other person is found;
(2) Restrain another of his liberty;
 (3) Hold another in a condition of involuntary servitude.
 (C) Whoever violates this section is guilty of kidnapping, an aggravated felony of the first degree. If the offender releases the victim in a safe place unharmed, kidnapping is an aggravated felony of the second degree."
[7] Aggravated robbery is defined in former R.C. 2911.01, in pertinent part, as follows:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon or dangerous ordnance, as defined in Section 2923.11 of the Revised Code, on or about his person or his control;
 (2) Inflict, or attempt to inflict, serious physical harm on another.
"* * *."
[8] The trial court noted in its opinion, filed pursuant to R.C.2929.03(F), that appellant was found guilty of both kidnaping and aggravated robbery. While it is true that appellant committed both offenses, these two offenses are a part of one statutory aggravating circumstance (R.C. 2929.04(A)(7)). In its opinion, the trial court repeatedly referred to the "aggravating circumstances" (emphasis added), possibly indicating that it considered kidnaping and aggravated robbery as two separate aggravating circumstances. The Supreme Court of Ohio has cautioned against this. See Green, 90 Ohio St.3d at 361. To the extent that the trial court erred in giving weight to kidnaping and aggravated robbery as two separate aggravating circumstances, we can correct that error in our independent weighing process. Id. at 363; Fox,69 Ohio St.3d at 190-191.