DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant Greg Hemsley appeals his convictions of two counts of grand theft from the Williams County Court of Common Pleas. Because we conclude that there was no error in the state's use of the IRS form in the cross-examination of Hemsley and that his conviction was not against the manifest weight of the evidence, we affirm.This case arose from a business relationship between Hemsley and Ron Carlin, owner and operator of a pheasant shooting range known as "Blue Spruce Game Birds" ("Blue Spruce") in Williams County. Sometime in February 2001, Hemsley and Carlin talked about the possibility of adding a clay shooting range to Blue Spruce.[1] Two months later, Carlin contacted Hemsley, ready to proceed with building the clay shooting course on his property. According to Carlin, Hemsley agreed to help design, build and promote the course as well as acquire the necessary equipment and supplies in exchange for free shooting for life for Hemsley and his wife.
 {¶ 2} By May, Carlin and Hemsley began the process of laying out the course, cutting down trees, and using a bulldozer to create trails through the woods. On May 24, 2001, Hemsley asked Carlin to write a check payable to Hemsley's business Apex Solutions Group ("Apex") in the amount of $3,545. The money was to be used to purchase either a wobbler trap according to Carlin or a rabbit trap according to Hemsley. Hemsley wanted the check payable to Apex because the company could get a better deal than if Carlin issued a personal check.
 {¶ 3} On May 29, 2001, Hemsley had Carlin issue another check for $28,540 to Apex for 14 automatic traps he had ordered from Pro-Matic in Pennsylvania and which were to be ready for pick up in a week. Hemsley agreed to wait to cash Carlin's check because Carlin was waiting for a $50,000 loan to clear. Hemsley said he would pay for the traps and then reimburse himself with Carlin's check.
 {¶ 4} When Carlin came back from bear hunting in early June 2001, Hemsley reported he got a great deal on clays and shells ordered from Dawson's in Massillon, Ohio. Hemsley stated he had paid for them and that Carlin should write Apex a check for $10,704.10 for his reimbursement. Carlin did so on June 14, 2001. The clays and shells would be delivered to Findlay, Ohio where Hemsley and Carlin would pick them up.
 {¶ 5} From the remainder of June through November 2001, Carlin issued four other checks payable to Hemsley totaling $2,662.60 for various materials. Although Carlin received the equipment and supplies paid for by these later checks, he never received the traps, clays or shells supposedly paid for by the May 24, May 29, or June 14 checks.
 {¶ 6} Carlin began to question Hemsley. From June 2001 until February 2002, Hemsley gave several excuses to explain the missing traps and supplies, including that the equipment was back-ordered, it was sold out from under them, it could not be delivered because of September 11, or they had missed the delivery dates. Eventually Carlin demanded that Hemsley recover his money from Pro-Matic and Dawson. Hemsley continued to make excuses, even telling Carlin that he had hired a lawyer to get the money back for him. The money, however, was never returned.
 {¶ 7} In February 2002, Hemsley was indicted on one count of theft and two counts of grand theft. Count 1 covered the May 24 check for $3,545; Count 2 was for the May 29 check for $28,540 and Count 3 included the June 14 check for $10,704.10. Hemsley was tried by a jury on May 13 and 14, 2002 and was found guilty on Counts 2 and 3. He was sentenced to 16 months on each count, to be served consecutively.
 {¶ 8} Hemsley raises the following four assignments of error on appeal:
 {¶ 9} "I. The convictions of appellant should be reversed, owing to the fact that appellant was prejudiced by evidence which was admitted in violation of discovery rules and the rules of evidence.
 {¶ 10} "II. The convictions of appellant should be overturned owning to the ineffective assistance of trial counsel.
 {¶ 11} "III. The convictions of appellant should be overturned because the number of errors, when taken as a whole, denied appellant a right to a fair trial.
 {¶ 12} "IV. The convictions of appellant should be overturned because the verdict of the jury was against the manifest weight of the evidence."
 I. Evidentiary Issues {¶ 13} In his first assignment of error, Hemsley argues that he was prejudiced and deprived of his constitutional right to a fair trial by the admission of evidence that violated the Ohio Rules of Evidence and the Ohio Rules of Criminal Procedure regarding discovery. The admission or exclusion of relevant evidence is within the sound discretion of the trial court and its decision to admit or exclude such evidence cannot be reversed absent a showing of an abuse of that discretion. State v. Combs
(1991), 62 Ohio St.3d 278. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157. When applying the abuse of discretion standard, a reviewing court is not free to substitute its judgment for that of the trial court.
 {¶ 14} The specific piece of evidence that Hemsley complains about is the IRS form 8362 that the state used during his cross-examination. We note that this document was not actually offered by the state for admission into evidence nor was it admitted by the trial court. The prosecutor, however, did have Hemsley review the document and testify about its contents. So while the document itself may not have been admitted into evidence, the substance of the document was revealed through the state's questions.
 A. Rules of Discovery {¶ 15} At trial, Hemsley objected to the use of the IRS form by the state because the form had not been provided in discovery. Hemsley argues that the state violated the rules of discovery because, although the state had intended to use the document at trial and the document was material to the preparation of the defense, the state did not disclose the document to the defense. Discovery in a criminal proceeding is governed by Crim.R. 16(B)(1) which provides in pertinent part:
 {¶ 16} "(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant."
 {¶ 17} Hemsley argues that the state intended to use the document because it procured the document for the sole purpose of questioning Hemsley about his gambling. Hemsley asserts that the issue of gambling was raised for the first time on cross-examination. A review of the record reveals that this assertion is inaccurate. During direct, after Hemsley testified about the trouble he had in Akron, Hemsley was asked by his trial counsel whether any of the money involved in this case went toward gambling, and he stated, "No. I don't gamble anymore. I do have outstanding debts from my past because of my gambling, but none of those moneys went to either gambling or paying off my gambling debts."
 {¶ 18} At trial, the prosecutor had stated that he did not intend to offer the IRS form for admission into evidence and, in fact, did not offer it. The state is required to provide in discovery materials it reasonably anticipates using at trial. See State v. Finnerty (1989),45 Ohio St.3d 104, 108. In State v. Hirtzinger (1997), 124 Ohio App.3d 40, the state obtained a copy of the defendant's ex-wife's cellular phone bill but did not disclose the document to the defense in discovery. During trial, Mrs. Hirtzinger testified that she had called her ex-husband from her cell phone after seeing him pull out of her driveway. On cross-examination, the defense asked Mrs. Hirtzinger if she had an itemized billing service for her cellular phone. The prosecution then introduced the bill on redirect. The Second Appellate District stated that "the eventuality upon which the prosecution's use of undisclosed evidence was predicated — i.e. the cross-examination of Mrs. Hirtzinger as to the bill's existence — was sufficiently remote to fall within the rule of Finnerty." Id. at 48. In this case, the IRS form was used only after Hemsley testified that he had not gambled. Use of the document was not a foregone conclusion and depended upon Hemsley testifying about his gambling. We find this is sufficiently remote so that the state was not required to provide the document to Hemsley.
 {¶ 19} Hemsley also maintains that this document was material to the preparation of his defense because had the defense known that the state possessed the document it would have severely altered its trial strategy by confronting the issue with Hemsley on direct examination so that the shock of its disclosure would have been reduced. Hemsley is not arguing that the document was in any way exculpatory, simply that he may have changed his trial strategy. Evidence is deemed material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.State v. Johnston (1988), 39 Ohio St.3d 48, 61. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Id.
 {¶ 20} The IRS form, however, is not material. It does not go to one of the elements of theft, nor is it likely that had the defense known the state had the IRS form the outcome of the trial would have been different. While he argues his trial strategy would have changed, Hemsley himself first addressed his gambling during direct testimony by stating none of Carlin's money went toward gambling. Hemsley maintained this contention even after being confronted with the IRS form showing he had purchased casino chips. He finally admitted the purchase, but testified he turned the chips in without actually gambling. The IRS form was just one piece of evidence used to impeach Hemsley. His prior convictions, his admissions of lying and his inconsistent testimony also undermined Hemsley's credibility. We therefore conclude that there was no discovery violation.
 B. Rules of Evidence {¶ 21} In addition to the alleged violation of the rules of discovery, Hemsley argues that the state's use of the IRS form 8362 during his cross-examination violated the Ohio Rules of Evidence because the document constituted hearsay evidence and was never authenticated. He also contends that this evidence was overly prejudicial. Hemsley did not object to the IRS form on these grounds however and, therefore, has waived all but plain error. In order to prevail under a plain error analysis, Hemsley bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.State v. D'Ambrosio (1995), 73 Ohio St.3d 141, 144; State v. Long
(1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 22} While it is true that the state did not authenticate the IRS form and that it constituted hearsay, the document itself was not admitted into evidence. It was used to test Hemsley's credibility during cross-examination. When questioning a witness for impeachment purposes, a party may refer to facts not in evidence so long as the method of impeachment is otherwise allowed and there is a reasonable basis to imply the existence of the impeaching fact. Evid.R. 607(B); State v. Gillard
(1988), 40 Ohio St.3d 226, 230-231. The IRS form provided the reasonable basis for the state's questions. Therefore, it was not error for the state to use the document during cross-examination.
 {¶ 23} Hemsley also complains that the state's presenting the actual document to Hemsley on the stand and allowing the jury to see that it existed was error because the document was never authenticated. However, Hemsley himself finally admitted he went to the casino and purchased the chips. Therefore, any error in allowing the jury to see that there was a document was harmless.
 {¶ 24} Finally, Hemsley claims that he was overly prejudiced by the trial court's refusal to strike the testimony regarding the document. Evid.R. 403(A) provides "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Hemsley argues that since the trial court refused to strike the testimony regarding the IRS form, the jury was permitted to consider the existence of a document and its contents as true even though there was no evidence to authenticate its veracity. However, as stated above, Hemsley admitted he went to the casino and purchased the chips. He also initially addressed the issue of gambling on direct examination. We conclude that there was no prejudice in allowing the testimony regarding the IRS form.
 {¶ 25} Based on the above, we find that the first assignment of error is not well-taken.
 II. Ineffective Assistance of Counsel {¶ 26} In the second assignment of error, Hemsley argues that his conviction should be overturned because of ineffective assistance of counsel. In Strickland v. Washington (1984), 466 U.S. 668, 687, the United States Supreme Court adopted a two-prong analysis to determine whether a defendant's conviction should be reversed on the basis of ineffective assistance of counsel. It requires a showing that (1) counsel's performance was so deficient as to not function as the counsel guaranteed by the Sixth Amendment, and (2) counsel's errors were prejudicial and deprived the defendant of a trial whose result was reliable. To warrant reversal, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 {¶ 27} "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Strickland at 689, 104 S.Ct. at 2065,80 L.Ed.2d at 694-695; State v. Wickline (1990), 50 Ohio St.3d 114, 126, 552 N.E.2d 913,925. Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of a trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel. Lockhart v. Fretwell (1993), 506 U.S.,,113 S.Ct. 838, 842-843, 122 L.Ed.2d 180, 189-191." State v. Carter (1995),72 Ohio St.3d 545, 558. Even a questionable trial strategy does not compel a finding of ineffective assistance of counsel. State v. Smith
(2000), 89 Ohio St.3d 323, 328, 2000-Ohio-166; State v. Clayton (1980),62 Ohio St.2d 45, 49.
 {¶ 28} Hemsley contends that he was denied a fair trial because his trial counsel's performance was deficient in five areas. Initially, Hemsley argues that his trial counsel engaged in an ill-advised trial strategy. Hemsley's trial counsel attempted to argue at trial that this matter was really a civil case rather than a criminal case. Essentially, he was trying to show that Hemsley did not intend to steal Carlin's money. Because Hemsley admitted that he lied to Carlin repeatedly and that he used the money to pay his business expenses, the only element that Hemsley's counsel could attack was the intent element. The argument that the matter should have been resolved civilly, rather than criminally because of a lack of intent, was successful in Orange Village v.Woolfolk (Oct. 5, 2000), 8th Dist. No. 77451, so we cannot conclude that Hemsley's trial counsel was ineffective for engaging such a strategy.
 {¶ 29} Second, Hemsley argues that his trial counsel failed to support his trial strategy with documentation and tried to admit useless evidence. While the state asked Hemsley on cross-examination for more specifics about his gross receipts and expenses, Hemsley's statements about his business mainly went unchallenged. The state did have Hemsley admit he never made lease payments for the building shown in defense exhibit J, but Hemsley testified that although his business did not actually move into that building, he had spent quite a bit of money remodeling it. Furthermore, the existence of any such documents is speculative and does not establish prejudice. See State v. Murawski, 8th Dist. No. 70854, 2002-Ohio-3631 at ¶ 8.
 {¶ 30} Hemsley's third complaint about his counsel's performance concerns the IRS form. Hemsley argues that his trial counsel should have requested a continuance so that evidence could have been obtained to support his claim that he redeemed the chips without gambling. Again, the existence of any such evidence is speculative; therefore, we cannot conclude a continuance would have been beneficial to Hemsley. Furthermore, even if Hemsley had been able to produce corroborating evidence that he cashed in the chips, this would not have changed the fact that Hemsley never purchased any of the traps, equipment or supplies covered by the checks in Counts 2 and 3. Therefore, Hemsley was not prejudiced by his trial counsel's failure to ask for a continuance.
 {¶ 31} Fourth, Hemsley argues that his trial counsel was ineffective because he failed to object to the IRS form on the grounds of hearsay. We concluded in the first assignment of error that the state could use the document for impeachment purposes; therefore, counsel was not ineffective for failing to object. Fifth and finally, Hemsley argues his trial counsel should have requested a limiting instruction regarding the IRS form. As Hemsley admitted to everything the document contained, no limiting instruction was needed. We therefore find that Hemsley's second assignment of error is not well-taken.
 III. Cumulative Error {¶ 32} In the third assignment of error, Hemsley alleges that the cumulative effect of the errors in this case deprived him of his constitutional right to a fair trial. Hemsley again cites to the failure to provide the IRS form in discovery, testimony about the IRS form, and the ineffective assistance of his trial counsel. In State v. DeMarco
(1987), 31 Ohio St.3d 191, paragraph two of the syllabus, the Ohio Supreme Court stated that although a particular error by itself may not constitute prejudicial error, the cumulative effect of the errors may deprive a defendant of a fair trial and may warrant the reversal of his conviction. "However, in order even to consider whether `cumulative' error is present, we would first have to find that multiple errors were committed in this case." State v. Madrigal (2000), 87 Ohio St.3d 378,398. In light of our findings in the other assignments of error, Hemsley's third assignment of error is not well-taken.
 IV. Manifest Weight {¶ 33} Hemsley argues that his conviction on Counts 2 and 3 was against the manifest weight of the evidence because there was no evidence that at the time he took the money he intended to use it for his own purposes. Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other.State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 {¶ 34} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 21, 42.
 {¶ 35} To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
 {¶ 36} Hemsley argues that his convictions were against the manifest weight of the evidence because he never intended to permanently deprive Carlin of his money. In support of his contention, Hemsley indicates he kept in contact with Carlin, ordered the Pro-Matic traps, contacted Dawson about the clays and shells, and purchased the other equipment for Carlin. He also claims that there is no difference in the evidence for Counts 1, 2 and 3, and because the jury acquitted him on Count 1, they clearly lost their way by convicting him on Counts 2 and 3.
 {¶ 37} Hemsley was charged with three counts of violating R.C.2913.02. Count 1 was theft; Counts 2 and 3 were designated grand theft in the indictment for amounts over $5,000 but less than $100,000. But for the amount of money involved, the elements for the three counts are the same: knowingly obtaining or exerting control over the property by deception with purpose to deprive the owner of the property. A person acts with purpose when it is his or her specific intention to cause a certain result. R.C. 2901.22(A). Because intent lies within the privacy of a person's own thoughts and is therefore not susceptible to objective proof, intent is determined from the surrounding facts and circumstances, and persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts. State v. Garner (1995),74 Ohio St.3d 49, 60.
 {¶ 38} Despite Hemsley's contention, the evidence for Counts 1, 2 and 3 was not identical. The record shows that Hemsley told Carlin that he had already paid for the traps, clays and shells and that he would use the May 29 and June 14 checks to reimburse himself. While there was an invoice for the Pro-Matic machines, Hemsley never paid for them or for the Dawson clays and shells. Instead, Hemsley admitted he used the money for his own business expenses. There is also evidence that he used some of the money to purchase casino chips shortly after Carlin's May 29 check cleared. In contrast, the evidence on Count 1 reveals that Hemsley did not lie to Carlin and say he had already ordered and paid for the equipment before receiving the May 24 check. There was also a dispute as to whether the money was for a wobbler trap or a rabbit trap. Whereas the testimony was clear on what the May 29 and June 14 checks were to purchase. Hemsley also stated that he had around $3,000 of Carlin's money, the approximate amount of the May 24 check.
 {¶ 39} While Hemsley testified that he returned the chips and never intended to deprive Carlin of his money, the jury was not required to believe Hemsley's testimony. The state had impeached Hemsley's testimony with his prior convictions, his own admissions of lying and his inconsistent statements at trial. At one point, Hemsley testified that the money he received from Carlin was not spent all at once, but he never explained why he did not immediately send checks to Pro-Matic or Dawson when the money was available to do so. As a result, we cannot conclude that the jury lost its way in finding Hemsley guilty on Counts 2 and 3. We therefore find that Hemsley's conviction was not against the manifest weight of the evidence and that Hemsley's fourth assignment of error is not well-taken.
 {¶ 40} Based on the above, we find that substantial justice was done to the appellant, and thus, the judgment of the Williams County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal.
 JUDGMENT AFFIRMED.
[1] It was disputed who actually initiated the conversation.